## THE STATE v. HUDSPETH, Appellant.

Division Two, December 18, 1900.

1. **Homicide:** MURDER IN SECOND DEGREE: EVIDENCE. A killing done without deliberation, but in malice and with premeditation, is murder in the second degree unless done in self-defense. And where there is evidence tending to show both malice and premeditation, this court can not reverse a judgment on the ground that under the evidence there is no murder in the second degree in the case.

2. **Examination of Jurors:** UNFAIRNESS. While the examination by the prosecuting attorney of some of the jurors smacks somewhat of unfairness, it was not of such a character as to justify a reversal of the judgment in this case.

3. **Challenges of Jurors:** TIME GIVEN DEFENDANT: NO EXCEPTIONS, If the defendant desires his objections that he was given only one hour of the twenty-four allowed for challenging jurors, to be considered by this court, the ruling of the court on such point must be objected to at the time and exceptions saved. This is a matter within the personal knowledge of the court, is a matter of exception, and can only be shown by the bill of exceptions, and not by affidavit.

4. **Homicide:** DECLARATIONS OF DECEASED: RES GESTAE. Before the killing deceased got a shotgun and went down the street swearing he would kill the defendant. His wife, another woman, and the owner of the gun, took the gun from him, and a half hour afterwards he was shot, and about fifteen minutes thereafter he said to the two women in the presence of another; "If you had not taken that gun away from me it would have been different," and again he made the same remark about an hour after the shooting to the owner of the gun, when he came to his side. These statements were made while deceased was lying on the floor near where he fell, while the heat of passion was yet on, and the circumstances connected with his death uppermost in his mind. Besides, they were voluntary, spontaneous and uninfluenced by persuasion, by suggestion or other consideration. *Held*, that they were admissible as a part of the *res gestae*, and it was reversible error to exclude them.

State v. Hudspeth.

5. ————: EFFORTS AT PEACE: RES GESTAE. Defendant proposed to show that while deceased and himself were cursing each other in front of the store where the killing afterwards occurred, and while deceased had a gun and was threatening to kill him, he sent a boy on a horse a short distance for a mutual friend to come and make peace between them, and that after deceased had given up the gun to its owner and gone home with his wife, he had sat down on a block in front of the store to wait for the coming of this mutual friend and the return of the boy, and while there for that purpose deceased came along and renewed the 'quarrel and the killing occurred. *Held,* that, for the reasons given on the other appeal in this cause (150 Mo. 12), this evidence was not admissible as a part of the *res gestae.* (GANTT and BURGESS, JJ., concurring; SHERWOOD, J., in doubt.)

6. **Evidence of Deceased Witness.** It is proper to permit the State to read to the jury the evidence of a deceased witness preserved in the bill of exceptions as his testimony on a former trial.

7. **Reputation: WITNESS RESIDENT OF ANOTHER NEIGHBORHOOD.** A witness who does not live in the neighborhood where the difficulty occurred and who does not know what his reputation was in that community, is not qualified to testify as to "the general reputation of deceased, for being a peaceable and quiet citizen, in the neighborhood in which he lived."

8. **Instruction: NO EVIDENCE.** No instruction should be given which there is no evidence to support.

9. **Refusal of Court to Instruct on Murder in First Degree.** The facts disclosed in this case show the homicide to have been murder either in the first or second degree, unless committed in self-defense. *Held,* that the trial court did not commit error in refusing defendant's request to decline to instruct for murder in the first degree.

10. **Innocence: PRESUMPTION: INSTRUCTIONS.** Defendant's instruction as offered told the jury that his presumption of innocence "is to be taken as evidence in the defendant's behalf," and these words the court struck out. *Held,* not error, since calling the presumption of innocence evidence adds no significance to its force; it is still a presumption which the law allows in defendant's favor, and requiring evidence to overcome it.

11. **Fair Trial.** Where defendant had a fair trial according to the forms of law, and, in so far as the record before this court discloses,

State v. Hudspeth.

by an impartial court and jury, it can not be said he did not have a fair trial.

12. **Trial Judge:** RESIGNATION OF SPECIAL JUDGE: REGULAR JUDGE'S COURSE. Where the regular judge has been disqualified and calls in the regular judge of another circuit, who tries the cause, and it is appealed and remanded for new trial, and before the case comes up for trial again, the judge who tried the cause resigns from his office, it is proper for the regular judge of the court to bring the prisoner before him for the purpose of calling in some other regular judge to try the cause, and such other regular judge, when so called in, has jurisdiction to try the case.

Appeal from Jackson Criminal Court.—*Hon. Samuel Davis,* Special Judge.

REVERSED AND REMANDED.

*B. L. Woodson, J. N. Southern, A. N. Adams* and *Wm. H. Wallace* for appellant.

(1) The court erred in permitting the prosecuting attorney on the *voir dire* examination of a large number of jurors to make inquiries of them touching their competency in a manner unwarranted by law and to defendant's great prejudice. (2) The court erred in not requiring the prosecuting attorney to hand the list of jurors with the State's challenges to defendant's counsel in time for defendant to have a just portion of the twenty-four hours allowed him by law, and by reason of which defendant's counsel had a little less than one hour of the twenty-four in which to make his challenges after the State had made its challenges. R. S. 1899, secs. 2623, 2624; State v. May, 142 Mo. 135; State v. Hudspeth, 150 Mo. 12. (3) The court erred in permitting the prosecuting attorney to make a continued assault upon defendant during the cross-examination of the witness Neal Hamilton, to-wit,

by insisting in substance that defendant had defrauded justice, that defendant "had himself taken before James Adams and a fake examination made and turned loose"—by insinuating that defendant's friends manipulated the coroner's jury, thus refreshing the minds of the jury as to the main charges contained in newspaper articles they had read and re-enkindling their prejudice against defendant.    (4)    The court erred in excluding the testimony of the witness Samuel Way as to the statement or declaration of deceased to Joseph Hudspeth made at the place of the shooting and immediately upon his seeing said Joseph Hudspeth.    State v. Hudspeth, 150 Mo. 12; Wharton Cr. Ev. (8 Ed.), secs. 691, 262; 1 Wharton Law of Ev., sec. 259; State v. Sloan, 47 Mo. 604; State v. Martin, 124 Mo. 514; Harriman v. Stowe, 57 Mo. 93; Entwhistle v. Feighner, 60 Mo. 214; Linderberg v. Mining Co., 9 Utah 163; Hunter v. State, 40 N. J. Law 495; Keyser v. Railroad, 66 Mich. 390; State v. Horan, 32 Minn. 394; O'Connor v. Railroad, 27 Minn. 166; Jordan v. Commissioners, 25 Gratt. 943; Ins. Co. v. Mosley, 8 Wall. 397; Rawson v. Haigh, 2 Bingham 99; Com. v. McPike, 3 Cush. 181; Moore v. State, 20 S. W. 563; Castillo's Case, 19 S. W. 892; Brownell v. Railroad, 47 Mo. 239; Com. v. Werntz, 161 Pa. St. 591; Ins. Co. v. Hillman, 145 U. S. 296; Com. v. Hackett, 2 Allen 136; Crookham v. State, 5 W. Va. 511; Hill's Case, 2 Gratt. 594.    (5)    The court erred in excluding the offered testimony of the witness Marlowe, that while the difficulty was in progress, and prior to the time as claimed by the State, that deceased withdrew from the same, defendant sent said Marlowe on defendant's horse for a mutual friend to make peace between deceased and himself.    Especially was this error in view of the fact that the State's contention at this second trial was that defendant was watching for deceased, with intent to kill him at the time of the shooting, and in view of instruction

13 given for the State, and refused instruction 3 of defendant. 1st. Because it was a part of the *res gestae*. It is true that on the former appeal we contended this evidence was competent as a part of the *res gestae*, and this court held it was properly excluded. But the statement of surrounding facts and circumstances at the first trial, as made by this court in its opinion, and the facts and circumstances as developed at the second trial, were materially different. People v. Vernon, 35 Cal. 49. 2d. We raised the point for the first time in the second trial that the sending of Marlowe for Pease was competent evidence for the purpose of rebutting the contention of the State (upon which great stress was laid throughout the second trial), that Hudspeth, at the time of the shooting, was sitting upon a block in front of Vancleave's store, lying in wait for the deceased. Defendant's contention was that he was not lying in wait; that he did not desire to kill deceased, and that he was sitting upon the block 'with his gun across his lap, waiting until Marlowe should return with his horse and with Mr. Pease. At the time this evidence was offered, the State had already plainly insisted upon its contention to the jury, that Hudspeth was lying in wait for Kessner, and this potent fact, tending to prove the contrary, should not have been excluded. (6) The court erred in permitting the prosecuting attorney, during the closing argument to the jury, to make an attack upon defendant's character, his character not having been put in issue, objection to such attack being overruled, no retraction or explanation being made, the prosecutor being in no manner rebuked or admonished to desist, no qualification being placed upon the prosecutor's remarks and the jury in no way told to disregard or limit them, the court of necessity thus adding its sanction to this attack, and giving the jury to understand that defendant had no right to object to this assault upon his character, and that the prosecutor's course was legal and proper.

J. M. McKnight v. United States, 97 Fed. Rep. 208; State v. Lee, 66 Mo. 165; State v. Upham, 38 Me. 261; Fletcher v. State, 49 Ind. 124; Stephens v. State, 20 Tex. App. 255; State v. Dockstader, 42 Ia. 436; Ackley v. People, 9 Barb. (N. Y.) 610; People v. White, 24 Wend. (N. Y.) 520; People v. Evans, 72 Mich. 367; Pollard v. State, 26 S. W. 70; Turner v. State (Texas), 45 S. W. 1020; State v. Woolard, 111 Mo. 248; Haynes v. Town of Trenton, 108 Mo. 123; State v. Furgerson, 152 Mo. 92; Quinn v. People, 123 Ill. 333; Angelo v. People, 96 Ill. 209; State v. Jackson, 95 Mo. 623. (7) The court erred in refusing instruction 8 asked by defendant. State v. Hudspeth, 150 Mo. l. c. 30; 1 Greenleaf Ev., sec. 34; State v. Upham, 38 Me. 261; United States v. Coffin, 156 U. S. 432. Our contention is that we are entitled to the instruction just as we asked it. (8) Neither Judge John W. Wofford nor Judge Samuel Davis had jurisdiction. State v. Sneed, 91 Mo. 552; State v. Hayes, 81 Mo. 574; State v. Hayes, 88 Mo. 344; State v. Shipman, 93 Mo. 147; State v. Higgerson, 110 Mo. 213; State v. Moberly, 121 Mo. 604; State v. Silva, 130 Mo. 440; Dawson v. Dawson, 29 Mo. App. 521; Lacey v. Barrett, 143 Mo. 220; State v. Punshon, 133 Mo. 44; R. S. 1899, secs. 2597, 1679, 2723.

*Edward C. Crow,* Attorney-General, *Sam B. Jeffries,* Assistant Attorney-General, *Ed. E. Yates,* Prosecuting Attorney, and *Frank G. Johnson,* Assistant Prosecuting Attorney, for the State.

(1) An unbiased review of all the evidence will convince one that the action of two juries in finding the defendant guilty of murder in the second degree was amply justified by the evidence; in fact they were warranted in finding the defendant guilty of murder in the first degree. That just im-

mediately before the shooting took place Kessner and defendant were calling each other names, and deceased was cursing defendant is undisputed; that Kessner assaulted defendant with the weight is disputed. It is only where there is no substantial evidence to support a verdict that the Supreme Court will reverse the action of a trial court on the ground claimed by defendant. State v. Hibler, 149 Mo. 478. (2) The defendant had his list of jurors for more than twenty-four hours before the trial, and he had ample time to make his investigation of the names on the panel. The record does not show any objection made at that time by the defendant, or at 'any other time to a ruling of the court on this point, and, of course, no exception could be saved. State v. Clark, 147 Mo. 20; State v. Hayes, 81 Mo. 574. (3) The acts and declarations of persons, other than the defendant, to be a part of the *res gestae,* must be contemporaneous in point of time. People v. Ehring, 65 Cal. 135; Monday v. State, 32 Ga. 672; Hall v. State, 48 Ga. 607; Hall v. State, 132 Ind. 317; Hays v. State, 40 Md. 633; People v. O'Brien, 92 Mich. 17; People v. Wong Ark, 96 Cal. 125; State v. Frazier, 1 Houst. Cr. Cas. 176; People v. Dewey, 2 Idaho 79; Shoecraft v. State, 137 Ind. 433; State v. Deuble, 74 Ia. 509; State v. Pomeroy, 25 Kan. 349; State v. Estoup, 39 Ann. 219; Kraner v. State, 61 Miss. 158; Collins v. State, 46 Neb. 37; Estell v. State, 51 N. J. Law 182; Denton v. State, 31 Tenn. 279; Jones v. Com., 86 Va. 740. The defendant's counsel, by a most diligent search, have been able to cull out from the mass of decisions on the subject a few extreme cases in which the circumstances peculiar to each of these cases might have justified the extreme holding in the case. An examination of the cases cited will show either such a dissimilarity between the facts in such cases and the one at bar, or such an extreme holding as to make it unsafe to follow them for the reason that the great mass of authorities

are against the contention of defendant.   State v. Noeninger, 108 Mo. 172; State v. Curtis, 70 Mo. 597; State v. Snell, 78 Mo. 204.   (4)   Defendant's next assignment of error is that "the court erred in excluding the testimony of witness Marlowe who was sent by defendant to George Pease for the purpose of getting him to make peace between the defendant and the deceased."   Defendant admits that there was no difference in the general facts of the case in the first and second trials.   The difference in his offer is in the language and not in the substance.   There was no change in the theory of the State on the second trial.   The evidence offered would not have strengthened the defense in the least.   (5)   The honorable judge who presided at the trial, familiar with all the evidence and incidents of the trial, after listening to the argument of defendant's counsel, thought there was nothing improper in the prosecuting attorney's remarks.   And in such cases much must be left to the discretion of the judge of the trial court, whose position best enables him to pass upon the question.   State v. Weiners, 4 Mo. App. 492; 66 Mo. 13; State v. Hamilton, 55 Mo. 520; Huckshold v. Railroad, 90 Mo. 559; State v. Brooks, 92 Mo. 588; State v. Kring, 1 Mo. App. 446; State v. Emory, 70 Mo. 463.   A new trial will not be granted because of improper remarks of the prosecuting attorney, unless they were so clearly outside the evidence and line of legitimate argument that any reasonable man would conclude that the jury were prejudiced thereby.   People v. Conley, 106 Mich. 424. The failure of a court to rebuke a State's attorney who, against the defendant's objection, indulges in invective, is not a ground for a new trial.   State v. Zumbunson, 7 Mo. App. 526; State v. Hamilton, 55 Mo. 520; State v. Bickel, 4 Mo. App. 572; State v. Frelinghuysen, 43 Minn. 265; State v. De Mosse, 98 Mo. 340; State v. McDonald, 85 Mo. 539; State v. Connell, 49 Mo. 282.   (6)   It is not error to refuse instruc-

tions, however correctly they may state the law of the case, where the proposition embodied in them or the substance and effect thereof has already been submitted in other instructions. State v. Smith, 80 Mo. 516; State v. Jump, 90 Mo. 171; State v. Moore, 101 Mo. 316; State v. Gates, 130 Mo. 351.

BURGESS, J.—At the June term, 1898, of the criminal court of Jackson county, the defendant was convicted of murder in the second degree and his punishment fixed at ten years' imprisonment in the penitentiary, for having theretofore, at said county, shot to death with a double-barrel shotgun, one Joseph W. Kessner. From the judgment defendant appealed to this court, where the judgment was reversed and the cause remanded. [State v. Hudspeth, 150 Mo. 12.] The trial was before the Hon. DORSEY W. SHACKLEFORD, who was then judge of the Fourteenth judicial circuit, but who resigned before the September term, 1899, of said criminal court, at which term the case was again set for trial. Judge SHACKLEFORD having resigned, Judge WOFFORD, the regular judge of said criminal court, called Judge SAMUEL DAVIS of the Fifteenth judicial circuit to try the case, and before him and a jury defendant was again convicted of murder in the second degree, and his punishment fixed at ten years in the penitentiary. He appeals.

The homicide occurred at Lake City, a small village on the Missouri Pacific railway in Jackson county, on May 14, 1897.

Deceased was at that time the station and express agent at that place. Defendant lived in the country about 330 yards northwest from the depot. The principal street runs east and west to the railroad depot. Diagonally across the street from the depot, in a northwesterly direction, is situated the store of J. B. Vancleave, in front of which the shooting

occurred.   This store is on the north side of the street, on the southeast corner of the block and fronts south.   Near the southeast corner of the store is a block for the use of ladies in mounting their horses.   A short distance from this store and facing south on the same street is Mary Hudspeth's store; thence a little further west on the same street and fronting south is her dwelling; thence further west and on the south side of the street is the residence of Alonzo Kettle; thence still further west on the same street, and about 250 yards from Vancleave's store, is the house of the deceased Kessner.

Sometime during the month of March, 1897, Mrs. Rufus Hudspeth, the mother of Mary Hudspeth, received through the mail an anonymous letter, stating that Mary was acting very badly, and creating considerable talk through the country, because of her relations with Kessner, the depot agent (who was a married man), and that there was some talk of their elopement, etc.

Mrs. Hudspeth gave this letter to her daughter Mary, who gave it to deceased, who conceived the idea that defendant had written it, and threatened at different times to kill him if he did not own up to it.

On the morning of May 14, 1897, defendant rode up to the depot platform where deceased was, and said to him, "Good morning, Joe;" when deceased cursed and abused him, and said to him that he wrote the letter (which defendant denied), that, "You are a G————d liar, a G————d son-of-a bitch, I will kill you or make you own it, I will go and get my gun and kill you," and started home after his gun.

After deceased had gone home for his gun, defendant went to Vancleave's store, and asked for a pistol, but obtained none. In a very short time deceased started from his home carrying a double-barrel shotgun and came on down the street toward Vancleave's store, his wife having hold of him and begging him

not to go.   As they passed the house of Mrs. Kettle, deceased's wife asked her to assist in inducing deceased to return to his home.   Deceased finally went with his wife into the residence of Mary Hudspeth.   As deceased was coming down the street with his gun and had neared the house of Mary Hudspeth, defendant mounted his horse and went to his home and came back to Vancleave's store with his double-barrel shotgun.   Deceased and his wife and Mary Hudspeth were seen on the porch of Mary Hudspeth's house and in front of the same.   The ladies were trying to get the gun away from him.   Deceased was trying to get something away from Mary Hudspeth supposed by the witness to be the key to her store.   He said he wanted some shells for the gun.   After awhile Joseph Hudspeth, brother of Mary Hudspeth, came upon the scene.   The gun belonged to Joseph Hudspeth and he took the same away from deceased.   Deceased then went home with his wife.

After defendant had returned from his home to Vancleave's store with his gun, he took a seat upon the block near the southeast corner of the store.   Deceased was at this time out in the street in front of the lot between Mary Hudspeth's store and her residence, with the gun in his hands.   Among other things defendant said to him was, "You God-damned curly-headed son-of-a-bitch, come out from behind your wife's petticoats and do your fighting; I didn't take my wife and hide behind my wife's petticoat."   Defendant proposed to show that at this point in the difficulty, and while deceased still had the shotgun, and was threatening to kill him, he sent a boy named Marlowe on his horse a short distance in the country for George Pease, a mutual friend, to come to Lake City and make peace between himself and deceased, and that after deceased had gone home with his wife, defendant sat down on the block in front of Vancleave's store waiting for the return of the boy Marlowe with his horse and Mr. Pease.   This testi-

mony was offered as a part of the *res gestae* and for the purpose of showing that defendant was not watching for deceased at the time of the shooting, and for the purpose of rebutting the contention of the State at this second trial that defendant was watching for deceased while sitting on the block and was intercepting deceased in his pathway from his home to his place of business at the depot. This testimony offered for this purpose was excluded by the court to which defendant at the time excepted.

After Joseph Hudspeth had taken the gun from deceased and gone home, one Carr went to the house of deceased for the purpose of getting him to go to the depot and sell him a money order. Kessner started with Carr down towards the depot to get the order. When they approached within about thirty steps of Vancleave's store, defendant was still sitting on the block. The quarrel between deceased and defendant was then renewed, one of the two men, either Carr or deceased, remaking to defendant, "You are still waiting, are you?" According to the testimony of the State's witnesses, Carr and Roffe, defendant while sitting upon this block and seeing deceased nearing him, arose and told him to stop. Carr says that defendant said to him, "Get out of the way, old man." Told deceased not to come any closer, asked deceased where his gun was; stated that he, deceased, had gone after his gun. Deceased cursed defendant and told him that he did not need any gun. When defendant arose from his seat on the block he stepped back a little towards the southeast. One of the State's witnesses thought that he put the gun to his shoulder, another that he raised it in his hands. At any rate, all the witnesses agree that defendant did not shoot then and did not attempt to. Deceased, after cursing defendant and telling him that he was not afraid of him, passed rapidly into the store of Vancleave, Carr following him. Deceased at once picked up some scale

weights lying on the counter in the store and with a weight in each hand went to the front door and out on the platform in front of the store.

Carr, the State's witness, testified that he, Carr, was standing, at the time deceased went on the porch, between the two counters and not far from the front door. He says that deceased began the quarrel this time by cursing defendant. This is also the testimony of the only other witness, Lee Jackman, who testified as to this matter, both of them testifying on behalf of the State. Both Carr and Jackman say that Kessner was mad when he picked up the weights and went to the door. Carr says that Kessner was standing near the east facing of the door, erect, at the time defendant shot him. He could see a weight in his left hand which was next to the witness. Jackman says that deceased was standing erect the last time he saw him; that he, witness, was turning to go out of the back end of Vancleave's store about the time of the shooting. Whether he had turned before the shooting or not he couldn't tell. Drehr, a witness for the State, who said that he stood on the railroad east of the depot and saw the shooting, says that Kessner was standing erect at the time he was shot. Mrs. Nancy Way and Nellie Way, who saw the shooting, state that Kessner came to the door and on out near a sack which was east of the front door near the casing; that Kessner's left hand seemed very close to if not against this sack which placed Kessner somewhat east of the east casing of the door. Mrs. Way says that just at the moment the gun fired she had turned to walk back into the house, but when she last saw Kessner, which was but an instant before, he was standing in a stooped position with his right hand out from his body and facing Hudspeth. Nellie Way says she watched the difficulty from the time Carr and Kessner came down the middle of the road to the time of the shooting; says that Kessner had advanced somewhat east

of the east casing of the door and was standing in a throwing position with his head bent down and his right hand out somewhat from his body at the time the shot was fired. When Kessner fell he fell with his head against the west facing of the front door. Some of the witnesses thought he fell with his head and shoulders against this west casing. He fell stretched out lying northwest and southeast. Carr went immediately for Kettle, a blacksmith, whom he found at his shop just back of Vancleave's store; Kettle came at once with him to the scene of the shooting. Kettle found Kessner lying stretched out, one of the weights lying by his right hand and the other one between his legs, between the knee and the ankle. Carr testified that as he went out of the front door and passed Hudspeth in going for Kettle, Hudspeth asked him if that man didn't have weights in his hands. He also testified that as he came back from the blacksmith shop Hudspeth said: "A man can curse me part of the day but he can't curse me all day." Kettle says Hudspeth said to him, "Did you see them weights ?"

Doctor Twyman testified that he found three wounds on deceased: two on the left jaw, one a little to the left of the malar prominence which ranged downwards, inward and backwards, the other near to the angle of the inferior jaw and ranged in the same direction, downwards, inwards and backwards. The other was just at the top of the shoulder and ranged in the same way. Deceased had sustained an injury to the cord in the region of the neck, from one of the shots in the jaw. The shot had either struck the cord, or struck the bone and driven it into the cord, the spinal cord. This caused paralysis; the paralysis was instantaneous and would have caused the deceased to fall just where he stood and to drop whatever he had in his hands.

The witness Kettle, immediately after coming to where

deceased was lying, went to Buckner, about four miles away, for a doctor. He used a buggy and horse belonging to Mrs. Harris, at Lake City. The horse was already harnessed to the buggy which was standing in the street. He drove to Buckner and back as fast as the horse could go—"got all he could out of him." Witness thought it took him about fifty minutes to go to Buckner and back. Defense offered to show by Kettle that as soon as he returned from Buckner he went into Vancleave's store where Kessner was still lying, and that Kessner then said to Mrs. Kessner or Mary Hudspeth: "If you hadn't taken that gun away from me it would have been different." This offer was excluded by the court and defendant excepted.

Joe Hudspeth testified that after the shooting he was sent for and came from the country to Vancleave's store where Kessner was lying. About an hour after the shooting Samuel Way went over to Vancleave's store and saw Kessner lying there. Immediately after he, Way, had gone into the store where Kessner was, Joe Hudspeth came in. Kessner recognized Joe Hudspeth. Defendant here offered to show by the witness Way, that as soon as Joe Hudspeth came in the deceased immediately said to Joe Hudspeth: "If you had not taken that gun away from me it would have been different." This testimony was excluded by the court and defendant excepted.

There was evidence tending to show that deceased was a quarrelsome and dangerous man.

Other facts, it deemed necessary, will be stated in course of the opinion.

Over the objection and exception of defendant the court instructed the jury as follows:

"1.   The court instructs the jury that before they can convict the defendant, they must be satisfied of his guilt beyond a reasonable doubt. Such doubt to authorize an acquittal upon a reasonable doubt must be substantial doubt of the defendant's

guilt with a view to all the evidence in the case, and not a mere possibility of the defendant's innocence.

"2.   The court instructs the jury that the law presumes the innocence and not the guilt of the defendant, and this presumption of innocence attends the defendant throughout the trial, and at the end entitles the defendant to an acquittal, unless the evidence in the case when taken as a whole satisfies you of defendant's guilt beyond a reasonable doubt, as defined in these instructions.

"3.   The indictment in this case is a mere formal charge, and is not in itself any evidence against the defendant.

"Statements of counsel are not evidence and should not be so considered.

"Offers to prove certain alleged facts which may have been made in your presence are not evidence, and you should not take the same into consideration, nor allow yourselves to be in any manner influenced thereby.   Neither should the jury consider any testimony stricken out by the court.

"4.   The court instructs the jury that if you believe from the evidence that at the county of Jackson and State of Missouri, at any time before the seventh of December, 1897, the defendant did willfully, deliberately, premeditatedly, and of his malice aforethought, shoot Josiah W. Kessner with a loaded shotgun, inflicting upon him a mortal wound from which said mortal wound the said Josiah W. Kessner within one year thereafter at the county of Jackson and State of Missouri died, then you will find the defendant guilty of murder in the first degree and by your verdict simply say so.   In that case you have nothing to do with the punishment.

"5.   The court instructs the jury that if you believe from the evidence that at the county of Jackson and State of Missouri, at any time before the seventh day of December, 1897, the defendant did willfully, premeditatedly and of his malice

Vol 159 mo—13.

aforethought, but without deliberation, shoot Josiah W. Kessner with a loaded shotgun, inflicting upon him a mortal wound from which said mortal wound the said Josiah W. Kessner within one year thereafter at the county of Jackson and State of Missouri died, then you will find the defendant guilty of murder in the second degree and assess his punishment at imprisonment in the penitentiary for a term not less than ten years.

"6. The court instructs the jury that if you find from the evidence that at the county of Jackson and State of Missouri, at any time before the seventh day of December, 1897, the defendant shot Josiah W. Kessner with a loaded shotgun, inflicting upon him a mortal wound from which said mortal wound, the said Josiah W. Kessner, within one year thereafter, at the county of Jackson and State of Missouri, died, and that the defendant fired said shot while he was in a violent passion suddenly aroused by insulting or abusive language spoken by deceased to him, then such killing was not done with deliberation; but although the defendant may have fired the shot while in a violent passion suddenly aroused by insulting or abusive words spoken to him by the deceased, yet if such killing was done willfully, premeditatedly and of his malice aforethought as explained in these instructions, the defendant is guilty of murder in the second degree.

"7. If you find from the evidence that at the county of Jackson and State of Missouri, at any time within three years next before the seventh day of December, 1897, Josiah W. Kessner approached the defendant in a threatening manner and assumed an attitude which gave the defendant good reason to believe and he did believe that the said Josiah W. Kessner was then and there about to assault him with an iron weight, but not under such circumstances as to justify the defendant on the grounds of self-defense as defined in these instructions,

State v. Hudspeth.

and that such assault by said Kessner provoked on the part of the defendant a sudden heat of passion, and that in such heat of passion the defendant shot the said Kessner, from which shooting the said Kessner within one year thereafter, died, then you will find the defendant guilty of manslaughter in the fourth degree, and assess his punishment at imprisonment in the penitentiary for a term of two years; or at imprisonment in the county jail not less than six nor more than twelve months, or a fine of not less than five hundred dollars, or at both a fine of not less than one hundred dollars and imprisonment in the county jail not less than nor more than twelve months.

"8.   As used in these instructions:  'Willfully,' means intentionally, that is, not accidentally; 'Deliberately,' means in a cool state of blood, that is, not in a heat of passion, suddenly aroused by some real or supposed grievance; 'Premeditatedly,' means thought of beforehand, for any length of time however short; 'Malice,' does not mean mere spite, hatred or ill will as ordinarily understood, but that the shooting was wrongful and intentionally done; 'Malice aforethought,' means with malice and premeditation.

"9.   The court further instructs the jury that he who willfully, that is intentionally, uses upon another, at some vital part, a deadly weapon, as a loaded shotgun, must, in the absence of qualifying facts, be presumed to know, that the effect is likely to be death, and knowing this must be presumed to intend the death which is the probable and ordinary consequence of such an act, and if such deadly weapon is used without just cause or provocation, he must be presumed to do it wickedly or from a bad heart.   If, therefore, the jury believe from the evidence that the defendant took the life of Josiah W. Kessner by shooting him in a vital part with a shotgun loaded with gunpowder and leaden balls, with a mani-

fest design to use such weapon upon him, and with sufficient time to deliberate and fully form the conscious purpose to kill, and without sufficient reason or cause or provocation, then such killing is murder in the first degree; and while it devolves upon the State to prove the willfulness, deliberation, premeditation, and malice aforethought, all of which are necessary to constitute murder in the first degree, yet these need not be proven by direct evidence, but may be deduced from all the facts and circumstances attending the killing, and if the jury can satisfactorily and reasonably infer their existence from all the evidence, they will be warranted in finding the defendant guilty of murder in the first degree.

"10.    The court instructs the jury that if at the time the defendant shot the deceased he had good reason to believe and did believe that the deceased was about to immediately inflict upon him some great personal injury, and he shot him for the purpose of averting such apprehended injury, then you must acquit him on the ground of self-defense.    In such case it is not necessary that the danger should have been real and about to fall.    All that is necessary is that the defendant believed and had good reason to believe that such danger existed; on the other hand it is not enough that the defendant believed in the existing of such danger, but he also must have reasonable cause for so believing before he can be acquitted upon the ground of self-defense.    But if you believe from the evidence that the defendant sought, brought on, or voluntarily entered into the difficulty in which the deceased was shot, for the purpose of wreaking his malice and killing the deceased, then you can not acquit him on the ground of self-defense.

"11.    The court instructs the jury that when a person apprehends that someone is about to do him great bodily harm and there is reasonable cause for believing the danger imminent that such design will be accomplished, he may safely act upon

State v. Hudspeth.

such appearance and may even kill the assailant if that is necessary to avoid the apprehended danger; and the killing will be justifiable, although it may afterwards turn out that the appearances were false and there was in fact neither design to do him serious injury nor danger that it would be done. He must decide at his peril upon the force of circumstances in which he is placed for that is a matter which will be subject to judicial review; but he will not act at his peril of making that guilt if appearances prove false which would be innocence had they proved true. If, therefore, you believe from the evidence that at the time of the killing the defendant, J. Lamartine Hudspeth had reasonable cause to apprehend and did apprehend a design on the part of the deceased, Josiah W. Kessner, to do him some great bodily harm or to take his life, and that defendant had reasonable cause to apprehend and did apprehend immediate danger of such design being accomplished and that he shot and killed deceased in order to prevent the accomplishment of such design, then you will find the defendant not guilty on the ground of self-defense—and you are further instructed that it is not necessary in order to find the defendant not guilty on the ground of self-defense that the apprehended danger should have been actual or real or about to fall upon him. It is sufficient if from all the appearances at the time, the defendant had reasonable cause to apprehend and did apprehend a design on the part of deceased to do him some great bodily harm or to take his life, and that he shot and killed the deceased in order to prevent the accomplishment of such design.

"12. The court instructs the jury that if you believe from the evidence that during the first part of the difficulty, deceased declared to defendant his intention of going to his home and getting his shotgun and killing defendant, and that deceased went to his home for his shotgun for the purpose of

killing defendant, then defendant had a right to go to his home and arm himself with a shotgun for his own defense and to return to Vancleave's store or the street about the same, and to bring his shotgun with him for his defense, and if defendant did no overt act and did not return to said store or street for the purpose of killing deceased, whether wrongfully assaulted by deceased or not, then defendant did not lose his right of self-defense. If he was assaulted or was about to be killed by deceased or was about to suffer great bodily harm from deceased; and if you find that defendant returned to the street near Vancleave's store under the circumstances above indicated, and was without fault himself, then he had the right, if attacked by deceased in such a manner as to furnish reasonable ground for apprehending a design to take his life or to do him great bodily harm, to act upon appearances, and to defend his life, and defendant was not required to flee from the public highway in which he had been assailed, even though he could have fled with safety. In such case defendant had a right to stand his ground and defend himself as defined in other instructions.

"13. The court instructs the jury that if the defendant and the deceased had a difficulty at the depot, and that deceased went to his house and armed himself with a shotgun, but that thereafter deceased withdrew from said difficulty, and that the defendant after such withdrawal voluntarily renewed said difficulty with the intention at the time of killing deceased or inflicting great personal injury upon the deceased and did kill the deceased, then the danger, if any, in which the defendant found himself during said difficulty would not extenuate his offense or reduce its grade at all, but he is guilty of murder and the jury should so say in their verdict.

"14. The court further instructs the jury that if the defendant and deceased had a difficulty at the depot and the de-

ceased went to his house and armed himself with a shotgun, but that deceased thereafter withdrew from said difficulty and that the defendant, after the deceased had so withdrawn, voluntarily renewed said difficulty, but without the intention of killing or inflicting great personal injury upon the deceased, and that during said difficulty it became necessary for defendant to kill deceased to save himself from being killed or receiving. great personal injury, then the defendant can not be entirely excused on the ground of self-defense, but in that case you should find him guilty of manslaughter in the fourth degree.

"15.   The court instructs the jury that no words or epithets, however opprobrious or insulting, can justify the killing of the party who uses them.

"16.   Threats alone will not justify an assault.   But if you should believe from the evidence that the deceased had before the killing made threats against the defendant, and that the deceased renewed the difficulty after having once withdrawn therefrom, if he did so withdraw, and did any act or said anything, which indicated a purpose on his part to then carry said threats into execution by killing the defendant or doing him some great bodily harm, then you may take such threats into consideration, together with all the other circumstances proven, in determining the purpose of the deceased and the reasonableness of the defendant's apprehensions, if he had any, of his safety at the time of the killing.   But the jury are further instructed that even if the deceased Kessner had made threats against the defendant, still he had the right at all times to be upon any public street or thoroughfare in the orderly transaction or conduct of his business, and if while so conducting himself, he did not seek or bring on the difficulty which resulted in his death, but the defendant was the aggressor, then any threats made by deceased do not constitute any excuse or justification of the defendant for the killing of Kessner.

"17.   You are instructed that you will take into consideration the evidence as to threats made by the deceased prior to the killing.   If you believe that any of such threats were communicated to defendant, then such threat or threats may be considered by you as explaining the conduct and apprehensions, if any, of defendant at the time of the shooting.   You will also consider any threats you may believe were made by deceased and not communicated to defendant for the purpose of explaining the conduct and demeanor of deceased at the time of the shooting.

"18.   The jury are instructed that they will take into consideration the evidence as to the quarrelsome, turbulent and dangerous character of deceased and give it such weight as you deem it entitled to.   You may consider such evidence for the purpose of throwing light upon the conduct and demeanor of deceased during the difficulty between him and the defendant, and also for the purpose of throwing light upon the defendant's apprehensions, if any, at the time of the shooting.

"19.   If verbal statements of the defendant have been proven in this case, you may take them into consideration, with all the other facts and circumstances proven.   What the proof may show you, if anything, that defendant has said against himself, the law presumes to be true, because against himself; but anything you may believe from the evidence the defendant said in his own behalf, you are not obliged to believe, but you may treat the same as true or false, just as you believe it true or false, when considered with a view to all the other facts and circumstances in the case.

"20.   The jury are the sole judges of the credibility of the witnesses and of the weight and value to be given their testimony.   In determining as to the credit you will give to a witness and the weight and value you will attach to a witness's testimony, you should take into consideration the character of

the witness, the conduct and appearance of the witness upon the stand, the interest of the witness, if any, in the result of the trial, the motives actuating the witness in testifying, the witness's relation to or feelings for or against the defendant, or the alleged injured party, the probability or improbability of the witness's statements, the opportunity the witness had to observe and to be informed as to matters respecting which such witness gives testimony and the inclination of the witness to speak truthfully or otherwise as to matters within the knowledge of such witness. ' All these matters being taken into account with all the other facts and circumstances given in evidence, it is your province to give to each witness such credit and the testimony of each witness such value and weight as you deem proper. If upon a consideration of all the evidence, you conclude that any witness has sworn willfully falsely as to any material matter involved in the trial, you may reject or treat as untrue the whole or any part of such witness's testimony.

"21. The jury are instructed that if they believe from the evidence that the deceased Kessner had shortly before the homicide threatened to take the life of the defendant, J. Lamartine Hudspeth, and such threats were communicated to the defendant and caused the defendant to fear that an attack would be made upon him with intent to take his life or to do him some great bodily harm, then such threats will justify the defendant in acting more promptly and upon less demonstration of hostility than if such fears had not been so aroused; and if from the nature of the threats and the character of him who made them, together with his appearances, conduct and demonstrations at the time of the shooting you believe from the evidence that J. Lamartine Hudspeth had reasonable cause to apprehend and did apprehend that such threats were about to be accomplished and that the deceased was about to kill the de-

fendant or to do him some great bodily harm, then the defendant was justified in killing the deceased and your verdict must be not guilty, although the object of the person Kessner so threatening him was only to frighten him and there was no real danger.

"22.    The court instructs the jury that any testimony as to what Kessner said after the shooting is wholly immaterial in this case and should be excluded by you from your considcration in reaching your verdict.

"23.    It having appeared in evidence that there has been a former trial of this case you are instructed that you can not consider in any way the result of such former trial, and you will try this case as if there never had been any former trial whatever.    You must consider only the evidence produced in the present trial and be governed solely by the law as now declared to you by the court."

The court refused the third, fourth and eighth instructions asked by defendant.

They are as follows:

"3.    The court instructs the jury that there is no evidence in this case that at the time of the shooting defendant was or had been lying in wait for the deceased.

"4.    There being no sufficient evidence in this case to sustain a verdict of murder in the first degree, the defendant now before the instructions are given, asks the court to decline to' instruct upon murder in the first degree, and to instruct only upon murder in the second degree and manslaughter.

"8.    The court instructs the jury that the law presumes the innocence and not the guilt of the defendant, and this presumption is to be taken by you as evidence in the defendant's behalf.    This presumption of innocence goes with the defendant throughout the trial and protects him at every stage of the proceedings, entitling him finally to an acquittal at your hands,

State v. Hudspeth.

unless overcome by other evidence which satisfies you of his guilt beyond a reasonable doubt."

I.   It is insisted that defendant is not, under the evidence, guilty of murder in either degree.   While it is true that the evidence did not show that the homicidal act was done with deliberation which is essential in order to constitute murder in the first degree, yet if the killing was done in malice and with premeditation, it was murder in the second degree unless done in self-defense, and as there was evidence tending to show this to have been the case there was no error in instructing upon that theory.   There was no such want of evidence of defendant's guilt of murder in the second degree, as would justify us in reversing the judgment upon that ground.

II.   It is claimed that error was committed in permitting the prosecuting attorney, on the *voir dire* examination of a large number of jurors, to make inquiries of them touching their competency in a manner unwarranted by law and to defendant's prejudice.   While the examination of jurors touching their qualifications to sit as such, in criminal cases, should be conducted with the utmost fairness, and without a desire upon the part of the representative of the State to procure jurymen more favorable to it than to the defendant, the manner of such examination rests largely in the discretion of the court before whom the case is being tried, and unless it is clear that such discretion has been abused, and the examination unwarranted, this court will not interfere.   The prosecuting attorney should guard carefully the rights of the State, but should never let his zeal get the mastery of him, and thus become a persecutor rather than a prosecutor.   There is no pretense that any member of the panel of forty-seven jurors was an incompetent juror, and while the examination of the prosecuting attorney of some of the jurors smacks somewhat of unfairness, it was not of such a character, we think, as to justify a reversal of the judgment.

III. The point is made that the court erred in not requiring the prosecuting attorney to hand the list of jurors, with the State's challenges, to defendant's counsel in time for defendant to have a just portion of the twenty-four hours allowed him by law, and by reason of which defendant's counsel had a little less than an hour of the twenty-four in which to make his challenges, after the State had made its challenges. It is only necessary to say with respect to this assignment that the record does not show that any objection was made at any time by defendant, to the ruling of the court upon this point, and exception saved. This was a matter within the personal knowledge of the court, was a matter of exception, and could only be shown by the bill of exceptions, and not by affidavits. [State v. Clark, 147 Mo. 20.]

IV. There is nothing, we think, in the point made with respect to the conduct of the prosecuting attorney in the cross-examination of the witness Hamilton, or any other witness, which would justify a reversal of the judgment.

V. It is argued that the court erred in excluding the testimony of the witness Kettle as to the statement of deceased made at the place of the shooting. And in excluding the testimony of Samuel Way as to the statement or declaration of deceased to Joseph Hudspeth, made at the place of the shooting, and immediately upon his seeing said Joseph.

The statement of the deceased, which defendant proposed to prove by Kettle was made about fifty minutes after he was shot, and the statement of deceased which defendant proposed to prove by Samuel Way was made about one hour after deceased was shot. The question is, were these statements admissible as part of the *res gestae?* When this case was here before, we ruled that a similar statement claimed to have been made by the deceased in the presence of other parties immediately after the shooting, was admissible in evidence, as part of the *res*

*gestae;* and it must follow that proof of the statements of deceased to the same effect made to other persons fifty minutes or an hour after the shooting was also admissible for the same reason unless the time which elapsed after the shooting until those statements were made, rendered proof of them inadmissible.

As a rule, the statements of neither parties nor bystanders made after the event, are admissible in evidence, but this is not so when the statements are part of the *res gestae,* and "it is not necessary that said declarations, to be part of the *res gestae,* should be precisely co-incident with the act under trial. It is enough if they spring from and are made under circumstances which preclude the idea of design. The test is, were the declarations the facts talking through the party or the party's talk about the facts. Instinctiveness is the requisite, and when it is obtained the declarations are admissible." [Wharton's Criminal Evidence (8 Ed.), sec. 691]. The same author says, "Nor are there any limits of time within which the *res gestae* can be arbitrarily confined; they vary in length in each particular case." [Wharton Criminal Evidence, sec. 262.]

In State v. Gabriel, 88 Mo. 631, on a trial under indictment for larceny of sheep, where the transaction was made up of a variety of incidents extending over a period of several days, and was not at an end until the sheep were branded as his own by the defendant, all acts and words which occurred, or were related during that period of time, tending to show that defendant branded the sheep by mistake or inadvertence, and not with a larcenous motive, were held to be competent evidence in his behalf.

In Stagner v. The State, 9 Tex. App. 440, it was held that statements made by the injured party twenty minutes after he was shot, were so intimately connected with the wounding as

to negative the idea of manufactured testimony, and were admissible as part of the *res gestae.*

So in the case of Castillo v. The State, 31 Texas Criminal Reports, 145, it was held that the statements made by the injured party in a few minutes after she was assaulted, and also statements made about a half hour thereafter, while she was lying upon a bench, suffering, bleeding and prostrated, describing her assailant to another witness, were competent and admissible for the same reason.

In 1 Bishop New Criminal Proc. (4 Ed.), sec. 1087, it is said: "If, after an encounter which will end in death, the defendant or the wounded man makes a statement while the heat of it is on, though after the lapse of a period not definable in minutes, yet before there has been time to reflect and plan, it is admissible."

The statements which defendant proposed to prove were in almost the exact language of the statements claimed on the first appeal to have been made by deceased to Mary Hudspeth immediately after the shooting, which were held to be admissible. When the statements under consideration were made, the deceased was lying in the same place and in the same position as then. The heat of passion was still on, and the circumstances connected with the event uppermost in his mind. They were voluntary, spontaneous, and uninfluenced by persuasion, by suggestion or other consideration, and we think admissible as part of the *res gestae.* They tended to show a determination on the part of deceased to have killed defendant, if the gun had not been taken from him, and when taken into consideration with his repeated threats to kill defendant were of much importance to defendant in determining the question as to who was the aggressor at the time the fatal shot was fired.

VI. Defendant proposed to show that while deceased

and himself were cursing each other in front of Vancleave's store, and while deceased had the gun and was threatening to kill him, he sent a boy named Marlowe on his horse a short distance in the country for George Pease, a mutual friend, to come to Lake City and make peace between deceased and himself, and that after deceased had gone home with his wife defendant had sat down on the block in front of the store waiting for the return of the boy with his horse, and for Pease, but upon objection of the State the evidence was excluded. It is argued by defendant that the evidence was admissible as part of the *res gestae*.

This question was passed upon by us in the former appeal, and the ruling adverse to the contention of defendant, and we see no reason for departing from it.

VII. Complaint is made of the remarks of the prosecuting attorney in his closing address to the jury in which he reflected upon the character of defendant, which had not been put in issue. Defendant had not offered any evidence of his good character, and until this was done the State should not have been allowed to introduce evidence to show that his character was bad, and the prosecuting attorney should not have been permitted to supply, by gratuitous statements, that which under the circumstances he would not have been permitted to prove. We are not, however, disposed to reverse the judgment upon that ground, but as the case will have to be tried again, we trust that we shall not again have occasion to consider the question.

VIII. Another insistence is that the court erred in admitting the testimony of the deceased witness, Lee Jackman, no proper foundation being laid therefor. Jackman testified as a witness upon the first trial of this case, and it was shown to the satisfaction of the court that he had died before the last trial, and his evidence at the first trial, as it was shown by the

bill of exceptions taken at that trial, was read in evidence. And we think, under the showing made by the State, no error was committed in permitting it to be read.

IX.   The evidence of the witness, A. J. Gillespie, was introduced by the State for the purpose of showing that the general reputation of deceased in the neighborhood in which he lived, for being a peaceable and quiet citizen, was good.

This witness did not live in the neighborhood where deceased lived at the time of the difficulty, nor had he had an opportunity to learn what his reputation was in that neighborhood.

In 1 Greenleaf on Evid. (16 Ed.), sec. 461d, it is said: "The witness to reputation must be one who, by *residence in the community,* or otherwise, has had an opportunity to learn the community's estimate, and the preliminary inquiry, whether he knows the person's reputation, is usually insisted upon.   A person who lives out of the neighborhood is therefore not qualified." Under the rule thus announced it is clear we think that this witness was not qualified to testify to the reputation of deceased, and that he should not have been permitted to do so.

X.   Several of the State's instructions are criticised by defendant, but we think them free from substantial objection, with the exception of the twenty-second, which there was no evidence to support, and it should not have been given.

XI.   It is also claimed that the court erred in refusing the third instruction asked by defendant, but we are unable to concur in this view.   The instructions given, except the twenty-second, presented every phase of the case very fairly to the jury, and it was entirely unnecessary to give this one.   It does not seem to have been contended by the State that defendant was lying in wait when he shot deceased; at any rate no such question is presented by the instructions, hence this instruction was unnecessary and no error was committed in refusing it.

XII.   Nor was there error in refusing the fourth instruction asked by defendant.   The facts disclosed by the record show that the homicide was murder either in the first or second degree, unless committed in self-defense, and fully justified the court in so instructing.   The instruction was properly refused.

XIII.   A still further contention is that the court erred in refusing the eighth instruction asked by defendant. · The instruction read as follows:   "The court instructs the jury that the law presumes the innocence and not the guilt of the defendant, and this presumption is to be *taken by you as evidence in the defendant's behalf*.   This presumption of innocence goes with the defendant throughout the trial and protects him at every stage of the proceedings, entitling him finally to an acquittal at *y*our hands, unless overcome by other evidence which satisfies you of his guilt beyond a reasonable doubt."   It was refused as asked, the words in italics stricken out, and then given.   While the presumption of innocence in favor of a defendant upon trial for a criminal offense, is a rebuttable presumption, it requires evidence to overcome it, and to show his guilt beyond a reasonable doubt before he can be convicted, yet the calling it evidence adds no significance to its force or effect.   After all, it is still a presumption, which the law indulges in his favor.   No error was committed, we think, in the refusal of this instruction as asked.

XIV.   There is nothing in the record which we think justifies the assertion that defendant did not have a fair trial as the term is generally understood.   Certain, it is, he had a trial according to the forms of law, and in so far as appears from the record before us, by an impartial court and jury. That error was committed during the trial is no evidence that it was not fair and impartial.

XV.   A final contention is that the court was without
Vol. 159 Mo.—14.

jurisdiction to try the cause. This contention is predicated upon the following state of facts:

Prior to the first trial of defendant the usual affidavit as the law requires was filed alleging that Judge JOHN W. WOF-FORD, the regular judge, was prejudiced and would not afford the defendant a fair and impartial trial, and asking for a special judge to try the case. This motion was sustained and Hon. DORSEY W. SHACKLEFORD, of the Fourteenth judicial circuit of Missouri, was called in. Judge SHACKLEFORD accepted and assumed the duties of special judge for this case in the Kansas City Criminal Court and proceeded with the trial. The defendant was convicted of murder in the second degree. An appeal was taken to this court and the cause remanded for another trial. After the mandate reversing the cause was filed in the criminal court at Kansas City, Judge JOHN W. WOFFORD requested defendant's attorneys to have defendant in court for the purpose of calling in a special judge to try the case. Defendant appeared under protest and objected to Judge WOFFORD's making any order whatever in his case upon the ground that he was totally disqualified. Defendant's objection was overruled and the court made an order calling in Hon. SAMUEL DAVIS, of the Fifteenth judicial circuit in this State. To this action of the court defendant excepted. The bill of exceptions recites that Judge SHACKLEFORD had resigned and was no longer judge. No evidence was introduced to this effect and the records fail to show that any was introduced. It does not appear that any declination to act further was ever received from Judge SHACKLEFORD or any notice from him that he had resigned. Judge DAVIS accepted and came to Kansas City for the purpose of trying defendant. Defendant filed a plea to the jurisdiction maintaining that Judge DAVIS had no jurisdiction to try defendant's cause.

It is asserted that Judge WOFFORD had no authority to

State v. Hudspeth.

call in Judge DAVIS to try the case, because after having called in Judge SHACKLEFORD for that purpose the latter continued in exclusive control of the case to its final determination, and that Judge WOFFORD had no authority to take any action whatever in the case thereafter.

This precise question was before the court in the recent case of State v. Silva, 130 Mo. 440, and it was expressly held, that on the disqualification of a judge in a criminal case under our statute, where a judge requested by the regular judge to try a cause is unable to do so, the disqualified judge may select another, and there is no difference in principle between a case where a judge is called to try a case, and assumes to do so, but for some reason can not proceed with the case and declines to do so, and a case where a judge is unable to continue in charge of a case by reason of his death, resignation, or the expiration of his term of office. Judge SHACKLEFORD had no authority to appoint a judge to succeed himself in the trial of the case, even if he had felt disposed to do so, and when he resigned as judge of the circuit over which he presided it was the plain duty of Judge WOFFORD to call in the judge of some other circuit to try it. That this was the intention of the Legislature, is too clear for argument. Otherwise, under the circumstances of this case, Judge SHACKLEFORD having no authority to select a judge to try the case in place of himself, beside having failed to do so, the defendant could never be brought to trial under the indictment pending against him. Nor do we think that Judge WOFFORD was obliged to call in the successor of Judge SHACKLEFORD, or any particular judge after Judge SHACKLEFORD had resigned.

For the exclusion by the court of the evidence offered by defendant as part of the *res gestae,* we reverse the judgment and remand the cause for further trial.

*Gantt, P. J.,* concurs; *Sherwood, J.,* concurs with the exception of the sixth paragraph as to which he is in doubt.