## THE STATE v. HOLLOWAY, Appellant.

### Division Two, March 12, 1901.

1. **Homicide:** MURDER, SECOND DEGREE: SUFFICIENCY OF EVIDENCE. A number of witnesses for the State testified that defendant, who was in his own house, invited deceased to fight, and while the latter was attempting to take off his coat the defendant drew a revolver, and shot him. None of the witnesses saw any weapon in the possession of deceased. Defendant testified that deceased had a razor, and was pursuing him during the entire shooting, and cut him on the hand, but other witnesses testified that deceased was never near enough to cut defendant. Deceased was shot in the back, and an examination of his person failed to show a razor, and he denied having one. The mother and sister of defendant testified that deceased admitted that he was to blame, and they also testified that defendant's hand was cut, but officers who examined his hand on the succeeding day found no wound. Defendant was shown to have a bad reputation. *Held*, sufficient to sustain a conviction for murder in the second degree.

2. ———: ERRONEOUS INSTRUCTION: SELF-DEFENSE. Where deceased is shot in the back, and all the witnesses present at the time except defendant testify that deceased was not attacking defendant when the fatal shot was fired, and no wounds are found on defendant's person, an erroneous instruction on self-defense is not reversible error, though defendant, whose reputation was impeached, testified that the shot was fired in self-defense.

3. ———: ———: WHEN CONSIDERED. An erroneous instruction on murder in the first degree will not be considered on an appeal from a conviction for murder in the second degree.

Appeal from St. Louis County Circuit Court.—*Hon. Rudolph Hirzel, Judge.*

AFFIRMED.

*Matthews & Shackelford* for appellant.

(1)   The court had no authority or right to give the jury an instruction on murder in the first degree; by so doing, it gave the jury an impression that the defendant had committed murder.   (2) When "heat of passion" is used, it must be defined.   And the court ought to have defined "heat of passion" in such instructions used.   (3) The verdict is the result of prejudice, passion and partiality, as will clearly appear by a careful examination of all the evidence in the case.   State v. Young, 119 Mo. 495; State v. Primm, 98 Mo. 368; State v. Custer, 93 Mo. 242; State v. Packwood, 26 Mo. 340.   (4) There was not a particle of evidence authorizing the instruction for murder in the first degree; and the court misled and confused the jury by giving such instruction.   State v. Hunshon, 124 Mo. 448; State v. Lewis, 118 Mo. 79.   (5) There was no evidence on which to give an instruction on murder in the second degree.   The defendant should not have been convicted of a higher offense in this case than manslaughter—if convicted at all; and hence, the verdict is harsh and cruel, and is the result of improper instructions, given the jury by the court, together with the exercise of prejudice and passion on the part of the jury toward defendant.

*Edward C. Crow,* Attorney-General, and *Sam B. Jeffries,* Assistant Attorney-General, for the State.

The evidence in this case fully justifies the verdict of the jury.   While defendant complains because the court gave an instruction on murder in the first degree, yet there was sufficient evidence to warrant the same, and should a conviction in that degree have been rendered, this court would not have interfered.   The weight of the evidence is a matter solely within

State v. Holloway.

the province of the jury. We are unable to see how defendant can claim error on account of an instruction on the question of murder in the first degree. Instructions relating to higher degrees of the crime than that for which defendant was convicted, constitute harmless error. State v. Bulling, 105 Mo. 205; State v. Hopper, 71 Mo. 430; State v. Talbott, 73 Mo. 347; State v. Ellis, 74 Mo. 207; State v. Snell, 78 Mo. 243; State v. Nelson, 88 Mo. 126; State v. Anderson, 89 Mo. 312; State v. Stockwell, 106 Mo. 36. (2) It is insisted by defendant that error was committed by the trial court in failing to define the term "heat of passion," as applicable to the term "deliberation," as used in the instruction on murder in the first degree. The proposition resolves itself into the charge that an incorrect definition of the term "deliberately" was given the jury. In this, no reversible error will be found. Defendant was not convicted of murder in the first degree and, therefore, an incorrect instruction on that degree will not work a reversal of the case. State v. Snell, 78 Mo. 243. Even though the court improperly instructed on the question of murder in the first degree by failing to define "heat of passion," the case will not, for that reason, be reversed, as defendant was convicted of murder in the second degree. (3) No complaint as to the "prejudice, passion and partiality" of the jury is found in the motion for a new trial. Having failed to embody it in that instrument and call the trial court's attention to it in that manner, he can not now present it here. This court will consider no question that was not presented to the trial court in the motion for a new trial, except as to what defects may appear from the record proper.

SHERWOOD, P. J.—Some negroes had a dance in St. Louis county, about a mile and a half from Ellisville on the Clarkson road, on the night of the thirtieth day of December,

1899, at the house of Matilda Stafford, mother of defendant. The dance ceased about six o'clock next morning, and on its discontinuance trouble began between defendant and Austin Watts in the kitchen, about another glass of wine which defendant, the master of ceremonies, refused to let him have.    Thereupon, quarreling began between them, which resulted in Watts, who was evidently at the time trying to get away from defenddant, being shot in the back, by the fourth shot fired, whereupon he sank to the floor and died in a few days thereafter, his spinal marrow being nearly severed by the bullet.    Watts, at the time he was shot, was going out of the kitchen; he was going towards the east kitchen door; he was "moving pretty swift;" he had left the middle of the kitchen, and was trying to get away; he almost fell in the door.    Being raised up at his request, by two of those present, he was seated in a chair, when he said to those who assisted him, "I want you boys to search me and say if I have got a razor.    Holloway claimed I was after him with a razor."    He then said to Massey and Herman, "there is an iron handled knife in my right hand pocket."    Thereupon they searched Watts and found no razor on him, and only a little pocket knife which was closed, and which Watts gave to Herman to keep till he called for it.

Dr. Neitert testified that the bullet "entered the back (of Watts) about on a level with the eleventh dorsal vertebra, a little to the left of the median line."    And he stated further that the bullet penetrated the spinal vertebra, and almost severed the spinal cord, resulting in paralysis and death.

As a sample of the testimony given on behalf of the State, Lawrence testified in substance the following:    I know the defendant Floyd Holloway.    I knew Austin Watts in his life time; have known Holloway six years; I have lived in that neighborhood for the last six years.    Floyd was living at the Stafford house on the thirty-first of December last. I was there

on that day and in the kitchen at the time the trouble started; it was between seven and eight o'clock in the morning as near as I can get at it; we were having a little dance there. Floyd had left word at my house that he was going to have a watch raffled, and asked me and my wife to come over and we went over there and there was not enough come, and he didn't have it, and so we had a dance instead. Austin Watts and Will Booth furnished the music. The dance broke up about half past five o'clock. Just before this difficulty occurred, Floyd was in the other room somewhere; he was not in the room where I was. Joe Massey, John Stafford, Jim Herman and myself were in the kitchen talking about school days. There had been no trouble between any of us that I knew of. Directly Floyd, the defendant, came into the kitchen. Austin says, "I don't want to fight." I thought they were playing, but Austin says, "I don't want to fight. I would not raise my hand to hit you in here at all." Floyd says, "I guess you must be looking for something," and he says, "Yes, I want a drink of wine." And Floyd says, "I just awhile ago gave you a drink. Do you want it all?" Austin says, "No, I don't want it all. All I want is a drink of wine," and Floyd says, "I won't give you the wine." Austin says, "That's all right, I don't want to have any fuss. If you come down here for a fuss you can go back up stairs." Floyd says, "You make me go back up stairs." Austin says, "No, you can stay in your own house. If you want to fight, I will meet you somewhere and fight it out." Then Floyd says, "You black son of a bitch, if you can fight it out somewhere else, fight it out here," and Austin went to pull his coat off and Floyd put his hand in his pocket and I went for the door. Floyd says, "You black son of a bitch, if you can fight it out some place else, you can fight it out here." Austin didn't say anything, but pulled his coat off. Joe Stafford run and grabbed Floyd, and I saw the pistol coming out of Floyd's

pocket and I fell on my hands and opened the door and as the door opened the gun said t-o-o and a bullet struck over me.     I heard five reports.   I didn't see anything in Austin's hand when he took his coat off.   I didn't see him get out of his coat though, for when I looked back last he had his coat this way (illustrating), just as I was going for the door, Stafford had hold of Floyd.   I saw no cuts or bruises on Floyd's hand or face.

Stafford, defendant's stepfather, who was present in the kitchen when the shots were fired, and who, with another, tried to separate combatants, testified he saw no blood on defendant after the shooting was over.

Massey, who was present in the kitchen when the shooting occurred, testified he did not see any marks of cutting on defendant at the time; he saw he had his hand tied up, but didn't see any marks.

Herman testified that when defendant fired the first shot, Watts was about fifteen feet away from him, and that during the tussle Watts did not get close enough to defendant to cut him with a razor or knife, and that witness did not see Watts have any kind of weapon during the scuffle; and no witness testifies that he saw Watts with any weapon during that time, except defendant.   Booth testified that defendant was getting ready to shoot as Watts was pulling off his coat; that Watts, during the struggle was not nearer defendant than six feet, and that he saw no cuts on defendant.   Hamm testified that defendant said to Watts, "You can fight as good here as outside," and that as Watts was pulling off his coat, and started towards defendant, the latter pulled his pistol and began to fire, and that witness did not notice any blood on defendant's hands or head.

Defendant went to the county jail and surrendered himself on the first of January, 1900, and Kerth, the sheriff and keeper of the jail, testified that there was nothing the matter with de-

fendant's finger at that time, nor did he have it tied up.

Albert Autenrieth testified, that defendant Floyd Hollo-way came to Clayton on the day after the shooting and gave himself up; his forefinger was not bandaged. He said that he had gotten into some difficulty, and a man had struck him with a razor and had cut him on the hand and I said, "Floyd, I don't see any cut," and he said , "He hit me with a razor and that is the reason I shot him."

Heiss, Hock and Schumacher all testified as to defendant's bad reputation.

On his own hehalf defendant testified substantially as follows: I live at Ellisville, St. Louis county, Missouri, with my mother, Matilda Stafford. I was at home on the night of the thirty-first day of December, 1899. After I gave the raffle out and enough did not come, we postponed it and thought we would enjoy ourselves anyway, and I engaged Watts to play, and I told him if I found we didn't have enough to have a raffle I didn't want him because I couldn't pay him, but I told him if he wanted to stay there with the rest of the people he could do it; we had for refreshments wine, candy and cake, I had some difficulty with Watts the next morning; that commenced about six o'clock. Immediately before that I was up stairs, but I can't say where Watts was. When I left him he had his overcoat on and had bid me the time to go home. I left him at the kitchen door. After I had been up stairs for awhile Willie Booth called me, and I asked him what he wanted, and he said, "Austin Watts wants to see you." Well, I never said anything and I set there a while, and Willie called me again and I said, "What do you want?" and he says, "Austin wants to see you," but I set there with the door shut, and in a few minutes after that Austin called me and he says, "Come down, I want to see you," and when I got down to the foot of the steps he says, "Well, there is something more due me, isn't

there?" and I said, "What is it?" and he says, "I want more wine." And I says, "I told John Stafford to give you some; did you get it?" "Yes," he says, "but by God, there is something more than that due me." He says, "Do you suppose I would play here all night for nothing?" and I says, "Austin, you never played but a few sets, and you and me made an agreement before you played a single set, that as there was but a little crowd, you would stay and enjoy yourself with us, didn't you?" and I says, "I will go into the kitchen and if there is any money in there that I took up during the time of the dance, I will give it to you, and he came in behind me and shut the door, and he says, "By God, I want a glass of wine." And I says, "Well do you want the jug?" and he says, "No, I don't want the jug," and I says, "Austin you got the glass of wine that you asked for before you were going home and I ain't going to give you any now." And he says, "Well, I want that wine or the money," and I says, "I don't owe you any." He says, "that's all right, I will see you after this." I says, "What?" And he says, "That's all right, I will meet you in a country road." I says, "What are you talking about, fighting?" And he says, "You can call it anything you want to." And I says, "If you are talking about fighting, we can settle that right here." He says, "I am a man amongst men," and I says, "So far as your fighting here is concerned, you can't do it, I don't keep this for a fighting hall." And he says, "By God, I am going to have my money or have you." And he started to take off his overcoat, and he ran his hand down like this (indicating) and threw his overcoat back on his shoulder and started down with his hand and that's all I could see. John Stafford grabbed me and Joe Massey him, and when Stafford grabbed me I tried to get loose and this boy struck over Stafford's shoulder at me. I threw up my hand like that and he struck me on the hand right here; there is the mark. I had a

revolver in my pocket. I had my hand on my pocket when Stafford grabbed me and he advanced and I hollered and said, "Look out Stafford, that fellow is going to cut me," and with that he struck me. Massey was trying to keep the fellow away from me. I shot four times. The first shot occurred when Stafford grabbed me by the arm and this fellow advanced. The next shot was fired in the tussle; he was advancing on me all the time. When I shot the fourth shot, he turned and made a couple of steps and fell, and I had another bullet yet, but I didn't shoot any more. He just turned as I shot; he was close enough to strike me if I hadn't dodged and got out of his way. The folks tied up my hand which was bleeding. I never went to the kitchen any more."

Defendant is supported in his testimony as to having had his hand cut by Watts by the testimony of his mother and sister, and that they bound it up and poured turpentine into the wound, and they also testified that immediately after the shooting they went into the kitchen, saw Watts seated in a chair, and he then admitted that he was in the wrong, and he only was responsible for what had occurred. But on this point their testimony is in direct opposition to the testimony of every other witness present. Nor is that part of defendant's testimony supported where he says: "So far as your fighting here is concerned, you can't do it, I don't keep this for a fighting hall." No other witness corroborates this statement, but all their testimony is at variance with it; indeed, it is directly repugnant to what defendant had testified to but a moment before.

Nor is there testimony countervailing that in relation to defendant's bad character; and defendant is the only one of the witnesses present, who testified to seeing Watts with a weapon in his hand. Hamm testified that so soon as defendant began to shoot, Watts began jumping around; and he also testified that Watts was never closer than three or four feet of defend-

ant while they were in the kitchen, and that when the third shot was made Watts was just turning to run, when witness sprang through the door, and on the outside heard the fourth shot.

The jury found defendant guilty of murder in the second degree and assessed his punishment at imprisonment in the penitentiary for the term of his natural life, and on this verdict judgment and sentence went in regular course, and defendant appeals.

Complaint is made on behalf of defendant that the verdict is "the result of prejudice, passion and partiality." There is no such ground in the motion for a new trial, and if there were, the testimony abundantly warrants a verdict for murder in the first degree.

Defendant offered to fight Watts in the house where they were. Nothing was said in that offer about a fight with weapons, and this being the case, if defendant, as the testimony clearly shows, agreed to fight Watts in the room where they were, in the ordinary fashion, in order to take undue advantage of him and under color of fighting on equal terms, uses from the inception of the contest, a deadly weapon on his adversary, as defendant did do, and as the testimony shows he did do, then, according to all the authorities, defendant is guilty of the highest grade of murder.    [State v. Christian, 66 Mo. 138.]

But it is insisted that the fourth instruction given at the State's instance, is incorrect as regards the doctrine of self-defense. This may be true, and yet that furnishes defendant no legitimate ground of censure upon that instruction for the palpable reason that *there was no self-defense in this case;* and the physical facts in the case as well as the evidence show deceased was shot in the back as he was attempting to escape from the murderous aim of his adversary, and they show also that defendant was not cut on the hand or on the face, as he pretends he was. The shot in the back of a fleeing adversary,

shows the true animus of defendant in doing the fatal act; shows it was not prompted by self-defense.    Neither courts nor juries should stultify themselves by believing physical impossibilities. No amount of perjured testimony can break down the fact that defendant was shot almost squarely in the back.    This could not have occurred if Watts was advancing on defendant all the time, as defendant swears he was.    [State v. Anderson, 89 Mo. 312; State v. Gilmore, 95 Mo. loc. cit. 564, 565; State v. Bryant, 102 Mo. 24; State v. Tabor, 95 Mo. 585; State v. Turlington, 102 Mo. 642.]

Nor in this connection should it be forgotten that defendant's reputation was thoroughly impeached.

The instructions as to self-defense, taken as a whole, seem to be substantially correct.

Instructions were given on murder in the first and second degrees, and on manslaughter in the fourth degree, as to which it is needless to say more than that they were very favorable to defendant, and covered all the ground legitimately covered by those asked by defendant.

Complaint is further made that error occurred in giving an instruction on murder in the first degree.    But this point is not open to contention in this court, owing to the fact that defendant was not found guilty of that grade of homicide.    [See cases cited in State's brief.]

In defining murder in the first degree, a definition is given of "deliberately" in connection with the term "violent passion," which is not defined.    Inasmuch, however, as defendant was not convicted of the grade of crime referred to, the failure to define "violent passion" can have worked him no hurt.    [See State v. Snell, 78 Mo. 240.]

For these reasons, judgment affirmed.    All concur.