THE STATE v. JOHN R. MALONE, Appellant.—39 S. W. (2d) 786.

Division Two, June 5, 1931.

1218

*M. G. Gresham, Bailey & Bailey* and *Harry C. Blanton* for appellant.

*Stratton Shartel,* Attorney-General, *Edward G. Robison,* Assistant Attorney-General, and *M. E. Montgomery* for respondent.

COOLEY, C.—Defendant shot and killed one Arthur Marshall. Being charged with murder in the first degree he was convicted of murder in the second degree and sentenced to twenty years' imprisonment in the penitentiary, and he appealed. He admitted the shooting, claiming self-defense.

The homicide occurred late in the night of September 25, 1929, in a small restaurant, locally called a "pig stand," at Sikeston, Missouri. There is no evidence to indicate that Marshall and Malone, whom we shall refer to as deceased and defendant respectively, had been unfriendly prior to that night. A short time, perhaps thirty minutes or so, prior to their meeting in the restaurant they had met at a roadhouse near Sikeston, where, it appears rather inferentially than positively, that deceased and one Bean had a difficulty in which Bean was cut, causing him to bleed, and that defendant offered his ministrations to Bean in assuaging the bleeding, which conduct of defendant was resented by deceased. The court refused to permit defendant to introduce evidence relative to the trouble between deceased and Bean further than to show threats then made by deceased toward defendant. It was shown that deceased said to others present that defendant seemed friendly to Bean and he (deceased) would "get both of the sons-of-bitches;" also that as deceased and a friend were trying to start their car defendant asked deceased if he might assist, and deceased refused the offer, calling defendant "a dirty little son-of-a-bitch" and adding: "I will get you later."

Deceased was considerably under the influence of intoxicating liquor and seemingly in an ugly mood at the roadhouse and when the fatal encounter occurred at the restaurant.

Defendant went from the roadhouse to the restaurant, parked his car in front of it and was inside eating a lunch when Marshall and one Davis entered and took seats at the counter. Marshall, accosting defendant, demanded that the latter pay him a dollar which he claimed defendant owed him. Defendant denied owing him anything and the words "damn liar" were passed. Some of the witnesses did not know which of the parties spoke those words, but defendant and a witness for the State testified that they were spoken by deceased. The evidence of the State and defendant shows that deceased drew an already opened knife from his pocket and advanced upon defendant. The latter left the room and went to his car from which he procured his pistol. He was advised, however, by a friend who had followed him out of the building, to leave, and did so. As he was driving away deceased, who had followed him out of the restaurant, was heard to repeat the epithet "son-of-a-bitch," referring to defendant, and to threaten to "get him tomorrow when he hasn't his gun," or as one witness said he stated: "I may clean

him tonight." It was further shown that when deceased first entered the restaurant he had his knife with the blade opened in his pocket.

Defendant drove to his home, which was very near, left his car in front of it and returned to the restaurant. It was but a few minutes, some witnesses say only three or four, from the time deceased and the others re-entered the building after defendant left, until defendant reappeared at one of the front doors. Just before he entered deceased in a loud tone said to one Crain: "Johnny Malone is the dirtiest little son-of-a-bitch in this town." He was then sitting on a counter stool a few feet from the door with his back to the door. Defendant, who claims he had started to find an officer to have deceased arrested, was just outside and heard the words and entered the door.

The evidence, as might be expected, is not altogether harmonious as to details of what happened thereafter. It seems clear that defendant, without then being first spoken to by deceased, said to him in substance that he (deceased) had been cursing and abusing him —one witness said cursing and abusing and threatening him. There was evidence that defendant said something further to the effect that he couldn't stand it any longer; that deceased apparently did not see defendant enter, as he was facing away from the door, but immediately upon being spoken to by defendant and discovering his presence he dropped his hands from the counter, turned around and rose or started to rise from the stool. One State's witness said deceased had his hands in his pockets as he turned and started to rise. The State's evidence tended to show that he did not turn so as to face defendant, but only so as to bring his left side toward defendant; that defendant, when he spoke to deceased, had a pistol in his hand, and that as deceased rose defendant began shooting. Four or five shots were fired in quick succession, striking deceased in the left side. Marshall stumbled a few steps and fell, dying almost instantly.

Witnesses for the State testified that, about the time or just before the shooting began, some one said: "Hold your belly," or "I'm going to make you hold your belly," but they could not say who said it. One testified also that immediately after the shooting a bystander exclaimed, "My God," and defendant said, "I had to do it," or something to that effect.

Defendant testified in substance: That he was game warden and that evening had gone to the country to see about some alleged duck shooting, taking his pistol in the car as was his custom, and stopped at the roadhouse on his way back; that he had had no trouble previously with deceased; that he there heard deceased say, referring to him: "That damn little son-of-a-bitch is helping Bean and I'll get

both of them;" that in the "pig stand" deceased asked him when he was going to pay that dollar, to which he replied that he did not owe him any dollar, and deceased thereupon called him a damn liar, raised up with an open knife in his hand, and that he, defendant, "backed out" and went to his car and got out his gun; that Buck Sitzes told him he "had better go on," and he got in his car and went to look for an officer; that as he drove past the pig stand he heard deceased refer to him as a "cowardly little son-of-a-bitch;" that he drove the car in front of his house (about the second house from the pig stand), leaving it there, and "started back across there and was going up there to hunt an officer." It should here be stated that if he was going to look for an officer the direct route to where such officer would likely be found led past the pig stand.

Giving his testimony as to what followed in narrative form, it was substantially as follows: Just as I got in front of the place I heard him make the remark, "that dirty little son-of-a-bitch," and when he said that I got nervous, and I didn't know what I would do, and I told him if he didn't stop I was going to have him arrested. My pistol was in my right coat pocket. I opened the door with my right hand. As I opened the door I stepped in and he was sitting with his side like this, kind-o' sideways, facing Davis, and when I stepped in I told him I didn't want him to be cursing and abusing me and threatening to kill me, and I intended to tell him if he didn't stop I was going to have him arrested, and before I had time to say that he swung around and started at me with his knife. I saw his knife. He raised up and the blade of his knife was like this, he was holding his knife like this, with the blade up his sleeve this way (indicating): I said: "Don't do that," and he said: "Hold your belly, damn you." I pulled my gun as I seen he was going to cut me and I immediately commenced shooting. He was about three feet from me. I don't know exactly how many times I shot. I quit shooting when I saw my life was not in danger. He acted like he was trying to get at me. I shot him to keep him from cutting me. When I stepped into the room I did not have any intention of taking his life or of hurting him at all.

It was shown by several witnesses that deceased's knife, open and with blade pointed upward, was found in his trousers pocket when the body was taken to the undertakers. At least three bullets passed through the body, one emerging and the other two lodging near the right nipple. One entered the left side below the arm pit, one about an inch and a half back of the middle line of the left side, and one slightly in front of that line. Two struck the left arm, one of them, perhaps both, going into the body. Deceased was a much larger man than defendant, weighing 170 to 175 pounds, while defendant weighed about 105.

I. The court refused to permit defendant to introduce evidence concerning the difficulty between deceased and Bean at the roadhouse shortly before the homicide further than to show the above mentioned threats of deceased toward defendant. And when defendant was asked on the witness stand whether deceased had made any remarks to him, while there, in connection with Bean, he started to answer: "He made a remark about me that I heard. Mr. Bean came in the door and was bleeding—" Here he was interrupted by the State's counsel with an objection and motion to strike out the answer, which was sustained. From other evidence it is inferable that it may have been at that juncture that deceased threatened to "get" defendant as well as Bean because of defendant's friendliness toward Bean.

Defendant should have been permitted to prove enough at least of the circumstances of the difficulty between deceased and Bean to show the nature and seriousness of that trouble and defendant's relation thereto. From the incidental references thereto that crept into the record the jury could not accurately judge whether or not it was of such nature as that defendant's proffered ministrations to Bean would likely have aroused deep-seated resentment or malevolence on the part of deceased toward defendant, or whether in fact defendant offered such ministrations. Nor could they know to what extent, if at all, defendant espoused Bean's cause. The State contends, and cites cases holding, that evidence of difficulties between a deceased and third parties, not connected with the trouble between the deceased and defendant, is inadmissible. But in this case the difficulty between deceased and Bean was not so disconnected. Defendant appears to have been present. Deceased's ill will and subsequent attitude toward him grew out of that difficulty and defendant's relation thereto and the jurors should have been permitted to learn enough of the circumstances to enable them to consider and judge in the light of facts rather than conjecture the actions and motives of the parties at the time of the shooting and the reasons defendant may have had to apprehend a deadly attack from deceased. The principle involved was thoroughly discussed and the reasons therefor set forth in State v. Burns, 312 Mo. 673, 280 S. W. 1026, 44 A. L. R. 848. See also State v. Testerman, 68 Mo. 408, 415; State v. Dettmer, 124 Mo. 426, 432, 27 S. W. 1117. Possibly enough appears from the subsequent conduct of deceased, his attack upon defendant when they first met in the restaurant and the opprobrious epithets and threats uttered by him, sufficiently to show his bitter animosity and to render harmless the exclusion of the proffered testimony. Since the cause must be remanded for other reasons we need only suggest that in the event of another trial the evidence should be admitted as above outlined.

For the same reason we need not consider the State's contention that defendant's offer of proof was not sufficiently specific to charge the court with error in rejecting the evidence defendant sought to introduce. That may be. Our discussion of the point is for the court's guidance in another trial.

II. Counsel for the State argue that if there was error in the exclusion of the evidence above referred to and in the instructions on self-defense it was not prejudicial because under the evidence there was no self-defense in the case; that the evidence and the physical facts show "that appellant sought and began the fatal difficulty with the felonious intent to kill deceased" and was not entitled to invoke self-defense. We do not agree with this contention. Defendant was not the aggressor in the first difficulty in the restaurant, if we may so divide the occurrences there. He testified that in returning he had no intention of killing or injuring deceased, but meant only to remonstrate against a continuance of the latter's abuse—not an unlawful purpose,—and the evidence does not show that he did any unlawful overt act prior to the time when, as he claims, deceased started to attack him. However improbable may seem defendant's story as to his purpose in re-entering the restaurant we cannot judicially say it is impossible. Its truth or falsity was for the jury to determine. If true, defendant did not by so re-entering the restaurant and speaking as he says he did to deceased forfeit his right of self-defense. [State v. Evans, 124 Mo. 397, 410, 28 S. W. 8; State v. Hudspeth, 150 Mo. 12, 32, 33, 51 S. W. 483; State v. Mathews, 148 Mo. 185, 194, 49 S. W. 1085; State v. Higgerson, 157 Mo. 395, 401, 57 S. W. 1014; State v. Garrett, 170 Mo. 395, 70 S. W. 686; State v. Ball (Mo.), 262 S. W. 1043, 1045; State v. Moore (Mo.), 29 S. W. (2d) 148, 150.]

Of the Instructions.

III. The following Instruction, No. 10, was given:

"The court instructs the jury that the defendant has advanced as a defense in this case that it was necessary for him to kill the deceased in order to avoid being killed himself or suffering some great bodily injury, and in this connection you are instructed that the burden of proving that he acted in self-defense rests upon the defendant, Johnny Malone, and not upon the State, and you cannot acquit the defendant on the grounds of self-defense unless he has shown to your reasonable satisfaction that he killed the deceased in lawful defense of himself as explained in other instructions given you in this case. If, however, upon the full consideration of all the testimony, you have a reasonable doubt of defendant's guilt you should acquit the defendant."

The giving of the above instruction was reversible error. The burden is not upon the defendant in a criminal case to prove his innocence, but upon the State to prove his guilt. Where the charge is murder, proving guilt includes proving that the homicide was committed with malice, which is an essential element of murder. Absent malice the killing is not murder. If the killing was justifiable in self-defense it was not malicious. The State charges that it was malicious, in other words not justifiable, which must be proved to make out the offense charged. The defendant is presumed to be innocent of the crime charged until proven guilty, yet by this instruction an essential element of the offense is assumed to exist unless defendant successfully carries the burden of proving by a preponderance of the evidence that it does not exist, for that is what "showing to the reasonable satisfaction of the jury" that he killed in self-defense would be understood by the jury to mean. The concluding sentence to the effect that if there is reasonable doubt of defendant's guilt he should be acquitted does not cure the fundamental error of telling the jury in clear and positive terms that the burden of proving to their satisfaction that he acted in self-defense rests upon the defendant. A lawyer might work out a construction to reconcile and harmonize that positive direction with the concluding sentence and the presumption of innocence to which defendant is entitled, but it is not likely a jury of laymen could do so. To say the best of it, the instruction was likely to be misunderstood by and to mislead the jury.

It is true that where the State's evidence shows a killing by the use of a deadly weapon upon a vital part of the body, nothing else appearing, murder in the second degree, from the necessities of the situation, will be presumed unless evidence is offered to repel that presumption. If in such case a defendant would escape the effect of that presumption he must come forward with some evidence. The "burden of evidence" or the necessity of offering evidence may thus shift during the trial. But the burden of establishing defendant's guilt rests with the State, does not shift, and when the proof is all in the final question for the jury is, are all essential averments of the indictment proved beyond a reasonable doubt? See State v. Howell, 100 Mo. 628, 663 et seq., 14 S. W. 4, discussing the defense of alibi; State v. Hudspeth, supra. In a murder indictment one of the essential averments is that the killing was done in malice, i. e., not justifiably.

The law on this subject is so well stated in State v. Wingo, 66 Mo. 181, that we feel justified in quoting at length:

"That it develops upon the State to establish by evidence the guilt of the accused beyond a reasonable doubt, will not be controverted. The defendant, by his plea of not guilty, puts in issue

every material allegation in the indictment. He is not required to plead specially any matter of justification or excuse. The case is not divided into two parts, one of guilt, asserted by the State, the other of innocence, asserted by the accused. He does not plead affirmatively that he is innocent, but negatively that he is not guilty; and on that issue, and that alone, the jury are to try the case throughout.

"There is no shifting of the burden of proof. It remains upon the State throughout the trial. The evidence may shift from one side to the other. The State may establish such facts as must result in a conviction, unless the presumption they raise be met by evidence, but still the burden of proof is on the State to establish the guilt of the accused beyond a reasonable doubt. [Ogletree v. State, 28 Ala. 693; Meady v. State, 5 Iowa, 433; Com. v. McKie, 1 Gray 61; State v. Flye, 28 Me. 316; Wharton's Am. Crim. Law, sec. 707.]

"In Stoke's case, 53 N. Y. 164, RAPALLO, J., said: 'The jury must be satisfied on the whole evidence of the guilt of the accused; and it is clear error to charge them when the prosecution has made out a prima-facie case, and the evidence has been introduced tending to show a defense, that they must convict unless they are satisfied of the truth of the defense. Such a charge throws the burden of proof upon the prisoner, and subjects him to conviction though the evidence on his part may have created a reasonable doubt of his guilt. Instead of leaving it to them to determine upon the whole evidence whether his guilt is established beyond a reasonable doubt, it constrains them to convict, unless they are fully satisfied that he has proved his innocence.'

"Wharton, in his work on American Criminal Law, Section 707, says: 'The principle may be broadly stated that when the defendant relies on no separate, distinct and independent fact, but confines his defense to the original transaction on which the charge is founded, with its accompanying circumstances, the burden of proof continues throughout with the prosecution.' "

And on page 185:

"The defendant is entitled to the benefit of a reasonable doubt of his guilt on the whole case, not only as to whether the case made by the State is open to reasonable doubt, but if the evidence for the State be clear and, in the absence of other evidence, conclusive, still if the evidence adduced by the accused, whether it establishes the facts relied upon by a preponderance of evidence or not, creates a reasonable doubt of his guilt in the minds of the jury, he is entitled to an acquittal. At no stage of the trial does he stand asserting his innocence. The authorities for this proposition are numerous."

In the same case, page 188, it is further said:

"It must be borne in mind that a declaration that if the State has made out a prima-facie case, it devolves upon the defendant to adduce evidence to repel it, is very different in substance and effect from one which declares that he shall establish the facts upon which he relies as a justification to the satisfaction of the jury—or by a preponderance of the evidence, for they are identical in meaning. The difference is as to the amount of evidence. We are not without authority in support of this proposition." [Citing cases.]

In State v. Hickam, 95 Mo. 322, 329, 8 S. W. 252, the court said:

"If, however, the court meant to tell the jury that if they found, from the evidence, that the defendant made an assault upon the witness with a pistol, then it devolved upon him to show that the assault was made under such circumstances as would justify it, it (the instruction) is faulty for three reasons: (1) It devolved upon the defendant the burden of proof; (2) it required a higher degree of proof than the law demands; . . . The defendant could not be lawfully convicted on the indictment . . . unless the shooting was done in malice with the intent to kill. If it was done under such circumstances as to be justifiable on the ground of self-defense, it was without malice. The defendant, through the whole of the trial, is clothed with the presumption of innocence of the offence with which he is charged. The State failed to make out its case, if, upon the whole evidence, it failed to prove, not to the satisfaction of the jury, for that might be done by a preponderance of the evidence, but beyond a reasonable doubt, that the shooting was done by the defendant with the intent to kill, in malice, i..e., under such circumstances as not to be justifiable on the ground of self-defense. [Nichols v. Winfrey, supra; State v. Wingo, 66 Mo. 181; Chaffee v. United States, 18 Wall. 517.] Malice and an intent to kill being essential elements of the offence with which the defendant was charged, it devolved upon the State to prove them the same as any other fact in the case necessary to establish guilt. From their nature they are not susceptible of proof by direct and positive evidence, but can and may be inferred from other facts. Malice may be inferred from the intentional use of a deadly weapon upon a human being, an intent to kill from its intentional use on, or at, a vital part, and the jury may well be told that these inferences may be made. They are deductions of fact, however, to be made by the jury in the light of all the facts and circumstances in evidence in the case; they are not conclusions to be reached at any stage of the case, if the attendant facts and circumstances militate against such conclusions to an extent sufficient to raise in the minds of the jurors a reasonable doubt of their correctness, and of defendant's guilt."

In State v. Hardelein, 169 Mo. 579, 585, 70 S. W. 130, it is said that making out a prima-facie case by the State which entitles it to go to the jury does not change the burden of proof, "which remains with the State throughout the trial, and whether or not the evidence is sufficient to overcome the presumption of innocence of defendant, and to establish his guilt beyond a reasonable doubt, when all of the evidence on both sides, including the presumptions, is considered, is for the consideration of the jury." [Citing cases.]

The principle enunciated in the above quotations is recognized and the error and misleading effect of a charge similar to Instruction No. 10, pointed out in a well considered opinion in People v. Shanley, 63 N. Y. Supp. 449, 49 App. Div. 56, holding that the burden of proof is on the State throughout and never shifts to the defendant. To the same effect see Veach v. State (Tex.), 159 S. W. 1069; People v. Turner (Cal.), 269 Pac. 204; McDonald v. State, 12 Ga. App. 526, 77 S. E. 655; State v. Hoerner (N. Dak.), 215 N. W. 277; State v. Partipilo, 139 Iowa, 474, 116 N. W. 1049; State v. Burzette (Iowa), 222 N. W. 394; State v. Varnado, 128 La. 883, 55 So. 562, in which a charge less injurious to defendant was held improper as shifting the burden of proof; State v. Conda, 156 La. 679, 101 So. 19; State v. McPherson, 144 Minn. 498, 131 N. W. 645; Covington v. Commonwealth, 136 Va. 665, 116 S. E. 462, in which the court discusses the shifting of the burden of presenting evidence during the trial, but holds that on the final weighing of the evidence the State has the burden on all the issues; People v. Duncan, 315 Ill. 106, 145 N. E. 810, that the burden is on the State throughout and that it is error to instruct that the burden of showing any fact is on defendant; People v. Cathey, 220 Mich. 628, 190 N. W. 753, holding that the burden is not on the defendant claiming self-defense to satisfy the jury of the truth of that claim, and that the error in a charge which would lead the jury to understand that such burden rested on defendant was not cured by other portions of the charge telling the jury that the burden was on the State to prove defendant's guilt beyond a reasonable doubt.

Counsel for the State cite in support of the instruction; State v. Roberts (Mo.), 242 S. W. 669; State v. Jones, 78 Mo. 278; State v. Alexander, 66 Mo. 148; State v. Tabor, 95 Mo. 585, 8 S. W. 744; State v. Underwood, 57 Mo. 40; State v. Brown, 64 Mo. 367; State v. Holme, 54 Mo. 153; State v. Grant, 76 Mo. 236; State v. Eason (Mo.), 18 S. W. (2d) 71. The last named case does not deal with this subject.

In the Roberts case the court held that there was no self-defense in the case, and that an instruction on that subject should not have been given, and added:

"If the evidence had warranted an instruction on self-defense, it was too favorable for the defendant. The burden is not on the State to prove that the killing was without justification. It is upon the defendant to prove any affirmative matter in excuse, justification, or extenuation of the offense, and he must show to the reasonable satisfaction of the jury that he acted in self-defense. [Kelley's Crim. Law (3 Ed.) sec. 253, and cases cited.]"

Kelley cites the Holme, Underwood, Brown, Alexander and Tabor cases, supra, and State v. Holloway, 161 Mo. 135, 61 S. W. 600.

In the Holloway case the instructions are not set out. The opinion says that if the State's instruction on self-defense was incorrect it furnished no ground for complaint, because there was no self-defense in the case, but added that the instructions on that subject, taken as a whole, seemed to be substantially correct.

In the Roberts case what was said on the burden of proof was *obiter dictum,* since the court had held that there was no self-defense in the case.

In State v. Jones, supra, the court approved an instruction telling the jury that if the defendant wilfully shot and killed the deceased "as charged in the indictment," then before such killing can be justified on the ground of self-defense it must appear to the reasonable satisfaction of the jury from the whole evidence that the defendant had reasonable cause to believe and did believe that deceased was about to kill him or do him great bodily harm, etc., and that defendant shot to, prevent such harm to himself. The instruction did not go quite so far as the one criticised in this case, since it did not specifically tell the jury that the *burden rested on the defendant* to satisfy the jury that he acted in self-defense. But, disregarding the contradictory element evidently overlooked by the court that if defendant shot and killed the deceased "as charged in the indictment" he was inevitably guilty, we think it went too far in stating that the justification claimed had to be shown to the reasonable satisfaction of the jury. If under all the evidence there was a reasonable doubt of defendant's guilt he was entitled to acquittal. In discussing the instruction the court said, page 285:

"When the State proves that a defendant did the killing, with a deadly weapon, this, without more, under our rulings, makes out a prima-facie case of murder in the second degree, and any matter of *excuse, justification or extenuation of the offense rests with the accused."* (Italics ours.)

If the language we have italicized is understood to mean only that the defendant must then offer evidence to repel the presumption if he would escape its effect, we think it states the law; but if that language be regarded as a holding that the *burden of proof thereupon shifts to the defendant* and as justifying an instruction to the jury to that effect, we disapprove it.

In the Alexander case the court cited approvingly State v. Wingo, supra. And while the court, reversing on other grounds, guardedly intimated that an instruction which erroneously placed on the defendant the burden of showing to the reasonable satisfaction of the jury that the killing was justifiable might have been rendered harmless by another instruction giving the defendant the benefit of a reasonable doubt on the whole case, it suggested a modification of the instruction that should be adopted on another trial. It is hardly authority for the State in this case.

In the Underwood case the criticized instruction declared that from an intentional killing with a deadly weapon the law presumed murder in the second degree in the absence of proof to the contrary, "and that it devolved upon the defendant to show, from the evidence in the cause, that he was guilty of a less crime or acted in self-defense." In disposing of the defendant's complaint of the instruction the court said it was difficult to see how it could have injured defendant since he had been convicted, not of second degree but of first degree murder, under instructions requiring a finding that the killing was willful, deliberate and premeditated; but added that the instruction was unobjectionable. The last observation seems to sustain the State's contention herein.

In State v. Brown, supra, the court held, without discussion, that it was not error to refuse an instruction telling the jury that the burden rested on the State to prove not only the killing, but that it was without justification, citing the Underwood case and State v. Hays, 23 Mo. 287.

The other cases cited by the State on this point do not treat specifically the point under discussion, viz., an instruction definitely placing on defendant the burden of proving self-defense to the satisfaction of the jury. There are observations in the opinions which might be so construed, or might be construed to refer to the necessity above adverted to of the defendant offering evidence to repel the presumption of murder in the second degree which would otherwise obtain from an unexplained intentional killing with a deadly weapon.

It would be illogical and inconsistent to hold, as the authorities generally do hold, that the defendant is presumed to be innocent until proved guilty and that the burden rests upon the prosecution to establish his guilt beyond a reasonable doubt, and at the same time to hold that the burden rests upon him to prove to the reasonable satisfaction of the jury that his act was justified, wherefore he is not guilty—in other words, to prove the non-existence of malice, an essential element of the crime charged. Instructions containing such conflicting directions are erroneous and must necessarily be confusing and misleading to the jury.

The cases cited by the State above referred to, in so far as they may be deemed authority for an instruction such as Instruction No. 10 herein, placing upon the defendant the burden of proving to the satisfaction of the jury that he acted in self-defense, should no longer be followed.

IV. Instruction No. 3 is criticised. It was as follows:

"You are instructed that one who wilfully, that is, intentionally, uses upon another at some vital point a deadly weapon, such as a pistol, must, in the absence of qualifying facts, be presumed to know that the effect is likely to produce death, and, knowing this, must be presumed to intend death, which is the probable consequence of such an act; and if a deadly weapon is so used upon another without just cause or provocation, he must be presumed to do it wickedly and from a bad heart.

"Therefore, if you believe and find from the evidence in this cause that the defendant killed Arthur Marshall by shooting him in a vital part of the body with the manifest design to use such pistol upon him and with sufficient time to deliberate and fully form the conscious purpose to kill, then such killing was murder in the first degree."

The first paragraph is correct as a legal proposition, but was unnecessary, and in attempting to apply it to the case in the second paragraph defendant's claim of self-defense was ignored. The instruction tells the jury peremptorily that if defendant killed deceased by shooting him in a vital part of the body with a manifest design to use the pistol upon him (all of which was conceded) and with sufficient time to deliberate and form the conscious purpose to kill, he is guilty of murder in the first degree, without reference to whether or not he was or believed himself to be in imminent danger and justified in so using his pistol in self-defense. Moreover, the facts and circumstances attending the killing were detailed by eyewitnesses and the question of whether or not the homicide was murder and if so the grade thereof did not rest upon presumption but upon the evidence. [State v. Swearingen, 269 Mo. 177, 190 S. W. 268; State v. Cole, 304 Mo. 105, 263 S. W. 207; State v. Solan (Mo.), 207 S. W. 782; State v. Burns, 278 Mo. 441, 213 S. W. 114.]

Appellant was not convicted of murder in the first degree, wherefore the State argues that the instruction, if erroneous, was harmless. Appellant contends it was prejudicial, because the only difference between the two degrees of murder is that deliberation is a necessary element of one and not of the other, and the jury may have understood from the instruction that if they did not find that there was deliberation but did find the other facts hypothesized they

must convict of murder in the second degree. There is force in appellant's argument, but since we are remanding the cause on other grounds we need only say that on another trial the instruction should not be given. In this connection, referring to appellant's criticism of the definition of "deliberately" in Instruction No. 2, defining murder in the first degree, we call attention to the recent decisions of this court in State v. Warren, 326 Mo. 843, 33 S. W. (2d) 125, and State v. Sharpe, 326 Mo. 1063, 34 S. W. (2d) 75.

V. The court gave instructions numbered 8 and 9, submitting self-defense. Number 8 told the jury: ". . . if, therefore, *you find defendant did not seek the difficulty* at the time the defendant shot the deceased, and that he, the defendant, had good reason to believe and did believe that the deceased was about to immediately inflict upon him some great personal injury," etc. (Italics ours.) The complaint is that by using the phrase "if you find the defendant did not seek the difficulty," without further defining what was meant thereby, the instruction improperly restricted or wholly eliminated self-defense "because the jury might find that by using the words he did (use) at the time, Malone 'sought the difficulty.'" And in this connection appellant insists that, especially in view of that condition or restriction of Instruction 8 his Instruction D should have been given. Instruction D in substance stated that if defendant had been driven out of the restaurant and threatened by deceased he had a right to arm himself for his own defense and to return, and if he did no overt act "and did not return to the said restaurant or street for the purpose of killing the deceased whether wrongfully assaulted by deceased or not, then defendant did not lose his right of self-defense," etc. It proceeded to state in effect that if defendant was without fault himself and was attacked by deceased in such manner as to give him reasonable grounds to believe he was about to suffer death or great bodily harm at deceased's hands, he had a right to defend himself. The instruction is substantially a copy of one given as State's Instruction No. 12 and approved in State v. Hudspeth, 159 Mo. 178, 60 S. W. 136. It would be more accurate if the phrase "for the purpose of killing the deceased" in the part above quoted were modified so as to include inflicting injury upon deceased.

We think there is merit in appellant's contention. Instruction No. 8 might have been understood by the jury as appellant contends, and so understood it would not correctly state the law. If defendant in returning to the restaurant, intended only in good faith to ask deceased to stop abusing and threatening him and to tell deceased if he did not stop it he, defendant, would have him arrested, and

if he did nothing more than to speak peaceably and inoffensively to deceased, as he claims, and did not address deceased for the purpose of provoking an assault by deceased in order that he might have an excuse for killing or injuring him, then his right of self-defense was not forfeited or abridged. See cases cited in Paragraph II. He was entitled to have his theory of the case clearly and explicitly submitted to the jury.

The complaint as to Instruction 9 is to that part of it dealing with what we have sometimes called imperfect self-defense. If there is any room under the evidence for the application of that doctrine appellant is in no position to complain of the instruction in that respect, as he concedes, because he asked and was given one like it.

VI. Error is alleged in the giving of Instruction No. 12, telling the jury in substance that words or epithets do not constitute nor justify an assault and that if defendant shot deceased because of words or epithets uttered by deceased or to avenge a difficulty between the parties earlier that night he could not be acquitted on such grounds. The instruction is correct as a statement of law and similar instructions have been approved by this court. But in several recent cases instructions in like vein have been condemned where self-defense was relied upon, as impairing the defendant's right to have all facts and circumstances fully considered by the jury as they might bear upon that defense, and as singling out and commenting on detached portions of what had occurred between the parties. [See State v. Yates, 301 Mo. 255, 256 S. W. 809; State v. Adkins, 284 Mo. 680, 225 S. W. 981; State v. Cole, supra; State v. Northington (Mo.), 268 S. W. 57; State v. Clough, ante, page 700, 38 S. W. (2d) 36.] On another trial that instruction should not be given.

Some other criticisms are made of instructions given and refused which we deem unnecessary to discuss. On a retrial the instructions should be made to harmonize with the views herein expressed. Other matters complained of, occurring during the trial, are not likely to occur again and need not be discussed.

The judgment is reversed and the cause remanded. *Westhues* and *Fitzsimmons, CC.,* concur.

PER CURIAM:—The foregoing opinion by COOLEY, C., is adopted as the opinion of the court. All of the judges concur.