**STATE of Missouri, Respondent,**

v.

**Perry BLAIR, Appellant.**

**No. KCD 27435.**

Missouri Court of Appeals,
Kansas City District.

Dec. 8, 1975.

Motion for Rehearing and/or Transfer
Denied Jan. 12, 1976.

Gary Eldredge, Eldredge & Sterling, Kansas City, Lee M. Nation, Law Student certified pursuant to Supreme Court Rule 13, for appellant.

John C. Danforth, Atty. Gen., Preston Dean, Asst. Atty. Gen., Jefferson City, for respondent.

Before WASSERSTROM, P. J., and SHANGLER and DIXON, JJ.

SHANGLER, Judge.

The defendant was convicted by a jury of first degree murder on an indictment found against him for that offense, and was sentenced to a term of life imprisonment. The jury verdict rejected the contentions of the defendant [submitted by proper instructions] that he was not guilty by reason of mental disease or defect excluding responsibility under § 552.030 and that the homicide was in lawful self-defense.

On this appeal, the defendant through his counsel contends for acquittal on the grounds that, as a matter of law, the State failed to prove beyond a reasonable doubt the first degree elements of deliberation and premeditation and, on the submission of self-defense, the nonexistence of justifiable

homicide. The brief of counsel contends also for a new trial because of error in the admission of bloody photographs of the victim. These issues are augmented by the *pro se* brief of the defendant[1] which contends that the indictment conferred no jurisdiction over his person or the subject matter of the offense since the grand jury proceedings which returned it were suspended by operation of law by the prior order of the circuit court for his mental examination to determine his fitness to proceed.

The procedural events which bear on this *pro se* jurisdictional contention originate in the Magistrate Court of Jackson County where the defendant was accused by complaint of first degree murder. While the cause was pending in that tribunal, a grand jury was empaneled in that county to inquire into the same offense. Then, on June 1, 1973, while the charge was pending in the magistrate court and while the grand jury inquest continued [and thus before any formal accusation by information or indictment bound the defendant to a felony jurisdiction], the defendant laid before the circuit court his motion for mental examination to determine his fitness to proceed [§ 552.020] and his mental responsibility at the time of the offense charged [§ 552.030]. The motion was allowed by the circuit court and the defendant was delivered to the hospital at Fulton for those determinations. Then, on June 8, 1973, the grand jury returned an indictment which accused the defendant of the murder, and on August 22, 1973, the defendant was formally arraigned on the charge in the circuit court. On that date, the charge pending in the magistrate court against the defendant for the same offense was dismissed by the State. The indictment resulted in the conviction from which the defendant now appeals.

The defendant contends the indictment [and hence the conviction] returned against him was invalid because the order of the circuit court which submitted him to mental examination under § 552.-020(2) was a determination that defendant lacked the capacity to proceed, and in that circumstance, § 552.020(7) suspended proceedings against him; thus the grand jury inquest, then pending, was discontinued by operation of law and was without jurisdiction to return the indictment against him.

The relevant provisions of § 552.020(2) as they bear on the issue recite:

> Whenever any judge or magistrate has reasonable cause to believe that the accused has a mental disease or defect excluding fitness to proceed he shall, upon his own motion or upon motion filed by the state or by or on behalf of the accused, by order of record, appoint one or more private physicians to make a psychiatric examination of the accused or shall direct the superintendent of a facility of the division of mental diseases to have the accused so examined by one or more physicians whom the superintendent shall designate.

And the relevant provisions of § 552.020(7) recite:

> *If the court determines that the accused lacks mental fitness to proceed, the proceedings against him shall be suspended* and the court shall commit him to the custody of the director of the division of mental diseases for so long as the unfitness endures or until the charges or proceedings are disposed of according to law. (Emphasis added.)

The plain wording of these statutes dispels the assortment of premises which gird the jurisdictional contention of the defendant: It is the adjudication after mental

---

1. During the pendency of the appeal, the defendant moved to allow a supplemental brief, *pro se.* Our reference to the trial record disclosed that the defendant acted *pro se* in numerous incidences of the defense so, in the particular circumstances, his motion was allowed in this court. Accordingly, we consider and rule the single point raised by the supplemental appellate brief. We discountenance, however, the congeries of points raised in two supplemental reply briefs, *pro se,* merely reargument of some positions and presentation of others properly for original argument.

examination that the accused lacks fitness to proceed—and not the preliminary order for that inquiry—which suspends the proceedings against the defendant. And, in fact, at the commencement of the trial on May 6, 1974 [long after June 8, 1973, when the indictment was returned] the trial court determined—in accordance with the report which issued on the June 1, 1973, order for examination and the subsequent report on the September 23, 1973, order for re-examination—that the defendant was fit to proceed. That adjudication has gone without dispute by the defendant both at the trial and here. Accordingly, we do not respond to the contention that the suspension of the proceedings under § 552.020(7) contemplates discontinuance of the grand jury function against a defendant found unfit to proceed in a separate accusation.[2]

■ On the next point, the defendant concedes that the evidence established a willful homicide, but contends that he was entitled to a judgment of acquittal because, as a matter of law, there was no proof that the killing was done with deliberation and premeditation, elements essential to conviction for first degree murder.

The defendant shot to death Paul Jackson, an employee of the downtown Pener Clothing Store, on the store premises. A week before the fatal event, the defendant had come to Pener's to try on a sport coat which he fancied but [according to the testimony of the manager] was refused by Jackson because the defendant was rank with perspiration and shirtless. They commenced to argue, and once outside, the quarrel turned into a fray. The testimony of the defendant had it that Jackson, 5 feet 8 inches in stature and 200 pounds in weight, lifted the defendant, who stood 5 feet 11 inches and weighed 150 pounds, above his head, threw him to the ground, choked him, pommelled his head against the pavement, and threatened to kill him should they confront again. The defendant filed a formal complaint with the police department against Jackson for assault, but he was killed before it was served.

The testimony of the defendant describes another encounter with Jackson before the shooting which resulted in his death. He told of a random meeting at a housing development when a car which Jackson occupied pulled alongside the defendant, who was afoot, and Jackson pointed a gun at him through an open window. The defendant fled and hid, but heard the reports of four gunshots. This incident prompted the defendant to exchange a two-shot derringer, his normal accouterment, for a revolver.

On the morning of the tragedy, the defendant had gone downtown to make application for employment at the City Hall. As he passed by the Pener Store, he looked in the window and did not see Jackson. On his return, he entered the store, walked toward the back of the store, saw a man before the mirror, but did not recognize him as Jackson. Jackson turned around and, according to the defendant, held what appeared to be a weapon in his right hand. This sight made him fearful for his life, and as Jackson raised his hand in his direction, the defendant pulled out his weapon, fired at him but struck the image in the mirror, he fired again and struck Jackson dead. The defendant turned and walked out of the store.

A different version of the fatal event was given on behalf of the State by Harold House, an employee at the store. He had been engaged in conversation with Jackson, who was combing his hair before the mirror, when the defendant entered the store,

---

2. We do respond to this extent: were the contention of the defendant otherwise valid that an order for mental examination for fitness to proceed under Chapter 552 operates to suspend all other proceedings against that defendant, including a grand jury inquisition, the order for his mental examination entered on June 1, 1973, before the indictment was returned on June 8, 1973 [and therefore before the circuit court acquired jurisdiction over the defendant by means of a formal accusation] was without authority of law (Constitution of Missouri, 1945, Article 1, § 17) and could not have served to suspend the indictment under which the defendant was convicted.

walked towards the rear and fired a gun into the back of the victim:

Q. Now, did someone enter the store while you were back there in the rear of the store?

A. Yes.

Q. And did you observe that man enter the store?

A. Yes.

Q. Okay. And what happened, what did he do?

A. He came towards the back of the store, passed me to about three feet from the victim, and shot five times.

Q. And as he approached the victim would he be facing the victim directly face to face, or how were they positioned?

A. No, he was facing the back of the victim.

Q. Did you see that man walk to the back of the store? How was it that he got to the back of the store?

A. Oh, he just walked in a casual manner, you know, a normal manner.

Q. He didn't run?

A. No.

Q. Now, what happened after he got within that three-foot distance of the victim?

A. Well, he started firing a gun into the back of the victim as the victim tried to move away from him.

Q. Did you see the gun?

A. Yes.

Q. When was it that you saw the gun?

A. When he had it out and I saw it in the mirror.

Q. Did you see it before it was fired?

A. No.

Q. Did you see Paul Jackson do anything?

A. He raised his hands.

Q. Was this before or after the gun was fired?

A. Before.

Q. After Mr. Jackson raised his hand what happened?

A. I saw the weapon in the mirror.

Q. Then what happened?

A. Then he began firing it and Paul tried to move away.

Q. Before Mr. Jackson began to try to move away, how many times did you hear it fired?

A. Twice.

Q. And then what happened?

A. Then as Paul was moving away he— as Paul was moving away the defendant followed him around with the gun and fired into his back.

The other evidence presented by the defendant was on the issue of mental disease or defect excluding responsibility formally tendered as a defense as required by statute. It was the testimony of Dr. Zwerenz that the killing was an impulse-driven act, and that at the time of the conduct alleged against him, the defendant was suffering from a mental disease which manifested in delusions of persecution. This conclusion was contradicted by Dr. Bratkowski who testified for the State that at the time of the event the defendant had the capacity to conform his conduct to the requirements of law.

The jury rejected the evidence of mental disease or defect excluding responsibility as well as the evidence of self-defense and convicted the defendant of first degree murder.

■ Conviction for first degree murder requires proof beyond a reasonable doubt of a willful, deliberate, premeditated killing of a human being with malice aforethought. In law, " '[d]eliberation is but prolonged premeditation . . . in a cool state of the blood' ". *State v. Mitchell*, 408 S.W.2d 39, 43[4] (Mo.1966). That standard of proof was submitted to the jury by MAI–CR 6.02 on the deliberation element for a conviction of first degree murder. The finding by the jury of deliberation, as well as the willfulness and premeditation elements of the of-

fense, however, may be inferred by the circumstances attending the homicide. *State v. Davis*, 400 S.W.2d 141, 145[1–4] (Mo.1966).

The contention of the defendant is that as a matter of law the evidence not only does not prove that the defendant reflected coolly upon taking Jackson's life, but that in fact he lacked the capacity to formulate that state of mind.

The evidence considered most favorably to the verdict shows that after the assault upon him by Jackson, the defendant exchanged his derringer for a weapon of more puissant caliber; that thus armed, he went to the store premises where Jackson worked and would be found, walked directly to the rear of the store and fired five shots into the back of the victim as he was standing before a mirror. On this evidence, the jury could have found that the defendant turned over in his mind the thought of killing Jackson before doing the deed.

The cognate argument of the defendant on this point contends for the doctrine which often goes by the misnomer "diminished responsibility". That principle, adopted into the law of Missouri by § 552.030.-3(1), allows evidence of mental disease or defect "[t]o prove that the defendant . . did not have a state of mind which is an element of the offense". This means that even where a jury finds the proof falls short of exculpation for criminal responsibility by reason of mental disease or defect, that evidence may be used relevantly to prove the defendant lacked a mental element essential to conviction of a higher degree of an offense, so that he is guilty of only the lesser degree of the crime. *State v. Anderson*, 515 S.W.2d 534, 537[1] (Mo. banc 1974).

■ The defendant concedes that the jury, on the contradictory medical evidence, could have found against his defense of mental disease or defect excluding responsibility, but contends that the medical evidence of his lack of capacity to formulate the deliberate or premeditated design to commit murder in any degree was undisputed and entitled him to an acquittal of murder. A jury is not obliged, however, to accept conclusions of medical experts even when unopposed, but may accord them as much credit as the jury may consider them entitled to under all the circumstances. *State v. Bannister*, 339 S.W.2d 281, 282[3] (Mo.1960). The jury had the right to refuse the inference offered by the testimony of Dr. Zwerenz that the killing was prompted by a fear born of a diseased mental process and accept, rather, evidence that the homicide was the result of a methodical purpose of the defendant to confront and kill.

■ The next contention is that defendant was entitled to a judgment of acquittal at the close of the evidence as a matter of law, because the evidence of the defendant of a lawful self-defense was not rebutted by the State. The defendant misconceives the postulate he argues. In our law, a defendant has no burden on the issue of self-defense. All that is required to raise the issue is that there be a prima-facie showing, from any evidence in the case, of the elements of self-defense. When that issue is raised, the burden rests on the state to prove beyond a reasonable doubt that the killing was not done in self-defense. *State v. Minnis*, 486 S.W.2d 280, 284[3–5] (Mo. 1972); *State v. Davis*, 342 Mo. 594, 116 S.W.2d 110, 112[6] (1938). The defendant construes this to mean that, since there was no evidence to contradict his testimony that he thought the black object [a hair comb] Jackson held in his hand before the mirror was a weapon or the medical evidence that his act of self-defense was a response engendered by a diseased mental process, the proof of justifiable homicide was uncontradicted and thus the offense was not a submissible jury issue.

As we have noted, the elements of first degree murder are deliberation, premeditation and malice. *State v. Anderson*, 515 S.W.2d 534, 537[1] (Mo. banc 1974). When self-defense appears in the trial of a murder, the absence of justification is proved— not [as the defendant supposes] by contra-

dictory evidence of the defendant's state of mind—but by evidence that the killing was done with malice, an essential element of homicide. *State v. Malone*, 327 Mo. 1217, 39 S.W.2d 786, 790[5] (1931); Perkins on Criminal Law, 2d ed., pp. 48–51. The conviction of the defendant rests on such proof, and this point of error is denied.

The final contention is that the court erred in the admission of seven bloody photographs taken in color. Only four of them, exhibits 3, 6, 17 and 18, have been filed with us, so our comments are governed by what is apparent from them. The defendant contends that since there was eye-witness testimony of the event and that defendant conceded the identity of the victim and that he fired the fatal shots, these photographs served no legitimate purpose. Three of the photographs depicted the victim, Jackson, lying in a pool of blood on the floor where he fell; the other, with the body disrobed in a supine position.

The rationale which validates photographs as evidence is that such depictions are superior than words as a means of description. *State v. Floyd*, 360 S.W.2d 630, 632[1–3] (Mo.1962). Photographs of the corpse of the victim of a homicide, may be shown in evidence, even if inflammatory, if they tend to prove any material element of the State's case, or corroborate the oral testimony of the State or refute defense testimony. *State v. Jackson*, 499 S.W.2d 467, 472[5–8] (Mo.1973). The most obvious materiality of these exhibits was both as a corroboration of the testimony of the pathologist that the gunshots entered the victim in the back, and a refutation of the testimony of the defendant that the sight of Jackson facing him with a weapon-like object in his hand, incited the fear for his life which prompted him to shoot Jackson.

The photographs were properly admitted.

The judgment is affirmed.

All concur.